Ex parte EQUITABLE TRUST CO. OF NEW YORK. EQUITABLE TRUST
CO. OF NEW YORK v. WESTERN PAC. RY. CO. et al. (CENTRAL
TRUST CO. OF NEW YORK, Intervener). In re EQUITABLE TRUST
CO. OF NEW YORK.

(Circuit Court of Appeals, Ninth Circuit. March 29, 1916.)

Nos. 2755–2757.

1. RAILROADS ☞192—MORTGAGES—FORECLOSURE—TIME FOR SALE.

The parties to a suit to foreclose a railroad mortgage were all agree-
able to a decree of foreclosure, and it was shown by affidavit that the
holders of a large majority of the bonds had deposited them pursuant to
a plan of reorganization, under which the reorganization committee had
procured an undertaking of certain bankers to secure an underwriting
syndicate agreement respecting the underwriting of a new bond issue;
that the undertaking had been performed; that under the plan and
agreement it must be operative before March 15, 1916, and would ex-
pire July 1, 1916; that to make the plan effective the properties must be
sold and such steps taken as would allow the benefits of the agreement
to be taken before the last-mentioned date; and that, if the plans should
fail by reason of delay, the parties to the reorganization agreement would
be liable in large sums for underwriting and expenses, and money for
necessary extensions of the railroad could be had only on less favorable
terms.  Held, that the parties were entitled to have the case proceed
with convenient expedition, unless some matter arose calling for inquiry
and delay.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642;
Dec. Dig. ☞192.]

2. RAILROADS ☞154—MORTGAGES—GUARANTIES—LIABILITY.

The P. Ry. Co. executed a mortgage to a trustee to secure a bond issue,
and contemporaneously therewith entered into a contract with the D.
and W. R. Cos. and the trustee, whereby the D. and W. Cos. (later con-
solidated as the D. Co.) agreed to purchase notes of the P. Co. to the
amount by which the gross earnings of the P. Co. should be insufficient
to pay its operating expenses, interest on bonds, etc., and to pay to the
trustee such amount as, with the amounts appropriated by the P. Co. for
the payment of interest and for sinking fund purposes, would pay such
interest and meet the required sinking fund payment, such payments
to the trustee to be credited on the purchase price of the notes.  These
payments on account of interest were to constitute a trust fund for the
payment of interest, and it was provided that failure of the P. Co. to
perform the agreement should not excuse the other companies from
performance.  It was covenanted that the agreement should run with
the railways of the several companies and bind parties acquiring such
railways.  The mortgage assigned all property of the P. Co. to the
trustee, including its rights under the contract, and provided for sale upon
default, either by public auction or in judicial proceedings, of all of the
mortgaged property, except the rights of the trustee and of the holders of
the bonds to require the D. and W. Cos. to make the stipulated payments
and to recover damages from them in default of such payments, and pro-
vided that such rights should survive to the trustee for the benefit of
bondholders.  Held, that the agreement of the D. Co. to make the speci-
fied payments to the trustee and its agreement to loan money to the P.
Co. on its notes were separable covenants, and, while the P. Co. could not
call on the D. Co. to make payments until it had applied its own earn-
ings, the secured mortgage bondholders could demand that the D. Co.
pay, no matter what the P. Co. did.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 472, 473; Dec.
Dig. ☞154.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. RAILROADS ⊕—167—MORTGAGES—PROPERTY COVERED.
Where the contract gave the P. Co. certain traffic rights over the roads of the D. and W. Cos., such traffic rights were covered by the mortgage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 519–533; Dec. Dig. ⊕—167.]

4. RAILROADS ⊕—179—MORTGAGES—GUARANTY—PARTIES ENTITLED TO EN-FORCE.
The rights vested in the trustee with respect to the enforcement of the suretyship of the D. Co. were reserved to the trustee, and it was the party in interest and authorized to bring suit to enforce the rights accruing to it as beneficiary.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 601–604; Dec. Dig. ⊕—179.]

5. RAILROADS ⊕—190—MORTGAGES—FORECLOSURE—DETERMINATION OF QUESTIONS AFFECTING OTHER PARTIES.
Whether or not the collateral agreement created an equitable lien or charge in the nature of a lien on the property of the D. Co. could not be adjudicated in a suit to foreclose the mortgage, without affording the D. Co. full opportunity to be heard.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 623; Dec. Dig. ⊕—190.]

6. RAILROADS ⊕—154—MORTGAGES—GUARANTIES—RIGHTS OF BONDHOLDERS.
The trustee was not a mere custodian of the payments required to be made by the D. Co. for the P. Co., nor were such moneys, when paid over to it, assets of the P. Co. in the same sense that its own earnings were; but the trustee was the covenantee of a trust fund for the benefit of the bondholders and was required to apply such moneys for their benefit.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 472, 473; Dec. Dig. ⊕—154.]

7. RAILROADS ⊕—167—MORTGAGES—PROPERTY COVERED.
While the P. Co. by the mortgage pledged all its assignable rights under the contract, the rights of the trustee under the contract were distinct from those of the P. Co., and were not included within the mortgage, and could not be sold under foreclosure, but remained in and survived to the trustee for the benefit of the bondholders.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 519–533; Dec. Dig. ⊕—167.]

8. RAILROADS ⊕—209—MORTGAGES—RECEIVERS—PROPERTY IN CUSTODY OF RE-CEIVER.
Where, in a suit to foreclose the mortgage, the court was not asked to give relief against the D. Co., nor to appoint receivers, except to protect and preserve the property subject to the mortgage lien, which did not include the right of the trustee to enforce rights against the D. Co., the receivers had a right to the custody of only such property as was the subject-matter of litigation described in the amended complaint.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 692–695; Dec. Dig. ⊕—209.]

9. COURTS ⊕—475(10)—JURISDICTION—SCOPE OF PRIOR PROCEEDING—MORT-GAGE FORECLOSURE—ENJOINING OTHER SUITS.
Where the court in the foreclosure suit was not asked to give relief against the D. Co., nor to appoint receivers, except to protect and preserve the property subject to the mortgage lien, and the D. Co. was not within the jurisdiction of that court, and such court had no possession of any property except that covered by the mortgage, it could not prevent the trustee from bringing an action in personam against the P. Co. and the

D. Co. in another jurisdiction, to obtain a construction of the collateral agreement and its enforcement against the D. Co.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1250–1257, 1259; Dec. Dig. ☞475(10).]

10. RAILROADS ☞179—MORTGAGES—GUARANTIES—ENFORCEMENT.

If the P. Co. had a right to proceed upon the liability of the D. Co., notwithstanding its own default, and if the receivers appointed in the foreclosure suit might enforce such right, the remedy for its enforcement was by a suit in the nature of specific performance, or by other plenary action to compel payment by the D. Co., and not in the suit to foreclose.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 601–604; Dec. Dig. ☞179.]

11. RAILROADS ☞186—MORTGAGES—FORECLOSURE—PARTIES.

Assuming that the contract created an equitable lien upon the property of the D. Co., this did not defeat the right of the trustee to fore- close without making the D. Co. a party; the D. Co. having no property within the jurisdiction of the court against which the court could enforce a charge.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 615, 616; Dec. Dig. ☞186.]

12. EQUITY ☞427(1)—CONFORMITY TO ISSUES.

While a court of equity may and should scrutinize matters brought before it and fairly within and directly related to the issues presented, its jurisdiction is always limited to the subject-matter in the case before it.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1001–1004; Dec. Dig. ☞427(1).]

13. COURTS ☞343—FEDERAL COURTS—PARTIES—ADJUDICATION AS BETWEEN PARTIES BEFORE THE COURT.

It is the usual rule in the federal courts that, if a case may be finally decided between the parties litigant without bringing others before the court who would, generally speaking, be necessary parties, such parties may be dispensed with if they are citizens of another state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 915, 916, 919, 920; Dec. Dig. ☞343.]

14. COURTS ☞343—FEDERAL COURTS—PARTIES—NECESSARY PARTIES.

If parties not before the court have rights so closely related to the issues between the parties in court that a final decision cannot be made between them without affecting the rights of those not before the court, the court may not dispense with such persons.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 915, 916, 919, 920; Dec. Dig. ☞343.]

15. COURTS ☞343—FEDERAL COURTS—PARTIES—BRINGING IN NEW PARTIES.

Contemporaneously with the execution of a mortgage by the P. Ry. Co., a collateral agreement was entered into under which the D. Co. agreed to loan the P. Co. on its notes the amount by which its earnings should be insufficient to pay operating expenses, interest on bonds, etc., and to pay the trustee such amount as, with payments by the P. Co., should be suffi- cient to pay interest and for sinking fund purposes. The mortgage covered the P. Co.'s rights under the collateral agreement, and authorized a sale upon default of all mortgage property except the rights of the trustee and the bondholders to require the D. Co. to make the stipulated payments, and provided that such rights should survive to the trustee for the benefit of bondholders. *Held* that, the D. Co. not being a necessary or proper party to a suit to foreclose the mortgage, equity rule 37, providing that any person may be made a party if his presence is necessary or proper

to a complete determination, did not authorize the court to order that the D. Co. be made a party and interplead.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 915, 916, 919, 920; Dec. Dig. ☞343.]

16. APPEAL AND ERROR ☞327(9)—PARTIES—NECESSARY PARTIES.

Where the court, in enjoining the trustee from suing the mortgagor and the D. Co. in another jurisdiction to enforce the collateral agreement, acted upon his own motion, and not upon any motion for an injunction by receivers appointed in the foreclosure suit, the receivers were not necessary parties to an appeal from the order granting the injunction.

. [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1796; Dec. Dig. ☞327(9).]

17. RAILROADS ☞186—MORTGAGES—FORECLOSURE—INTERVENING PARTIES.

An intervening petition of minority bondholders, alleging that the collateral agreement created an equitable lien on the property of the D. Co., that the trustee was not insisting upon such lien or using proper efforts to protect the rights of bondholders, but was acting against their interest, and that, if a foreclosure sale was had before the liability of the D. Co. was determined, it might be claimed that its obligation was extinguished, and asking that the D. Co. and others be made parties, and that no sale be had until the interests of the bondholders were properly protected, had no legal relevancy to the pending proceedings, as it was inconceivable that the trustee would incur the liability which would result if it should be recreant in the performance of its obligations, and it could not be held that its election to enforce any rights that the bondholders had under the collateral agreement after the foreclosure indicated infidelity to its trust, especially as it could not be seen how a bondholder not assenting to a plan of reorganization could be deprived by the foreclosure proceeding of his full right to insist on the enforcement of the collateral agreement.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 615, 616; Dec. Dig. ☞186.]

18. RAILROADS ☞192—MORTGAGES—FORECLOSURE—FIXING MINIMUM PRICE.

In a suit to foreclose a railroad mortgage, the court in its discretion has full power to make an order concerning an upset price upon the sale, if such procedure is deemed advisable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. ☞192.]

19. PROHIBITION ☞10(2)—RESTRAINING ACTS IN EXCESS OF JURISDICTION.

Where an order in a foreclosure suit requiring certain parties to become parties and interplead was in excess of the court's jurisdiction, the writ of prohibition was properly invoked.

[Ed. Note.—For other cases, see Prohibition, Cent. Dig. §§ 44–56; Dec. Dig. ☞10(2).]

20. MANDAMUS ☞3(1)—NECESSITY—PRESUMPTIONS.

In connection with an appeal from an order in a foreclosure suit, restraining the trustee under the mortgage from prosecuting a suit in another jurisdiction for the enforcement of a collateral agreement, the trustee applied for a writ of prohibition to prevent the court from compelling parties to such collateral agreement to interplead in the foreclosure suit, and for a writ of mandamus directing the District Court to grant its motion for a foreclosure decree. The court on appeal determined that the District Court could not restrain the trustee from prosecuting such other suit, and that it had no jurisdiction to require such parties to interplead. *Held*, that the presumption was that the District Court, on being advised of these views of the appellate court, would pro-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ceed to give the parties full measure of relief, and hence the writ of mandamus prayed for would be denied.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig § 8; Dec. Dig. ☞3(1).]

Appeal from the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Suit by the Equitable Trust Company of New York, as trustee, against the Western Pacific Railway Company and others. From an order (231 Fed. 478) enjoining complainant from prosecuting a different suit, complainant appeals, and also files original applications for writs of prohibition and mandamus, directed to Hon. William C. Van Fleet, Judge of the District Court for the Northern District of California, and to such District Court. Order reversed, writ of prohibition granted, and writ of mandamus denied.

Murray, Prentice & Howland and W. E. S. Griswold, all of New York City, and Jared How, of San Francisco, Cal., for appellant.

F. W. M. Cutcheon, of New York City, and John F. Bowie, of San Francisco, Cal., amici curiæ.

Garret W. McEnerney and John S. Partridge, both of San Francisco, Cal., for appellee Western Pac. Ry. Co.

Pillsbury, Madison & Sutro, of San Francisco, Cal. (Frank D. Madison, of San Francisco, Cal., of counsel), for appellee intervener.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The Equitable Trust Company of New York, as trustee, instituted foreclosure proceedings in the District Court in the Northern District of California to foreclose the first mortgage of the Western Pacific Railway Company, bearing date September 1, 1903, but acknowledged and delivered June 23, 1905. The trust company, as trustee, plaintiff in the court below, and appellant here, also asked that a receiver be appointed pendente lite. Jurisdiction was based upon diversity of citizenship.

The complaint sets forth that the entire amount of bonds secured by the mortgage sought to be foreclosed, $50,000,000, had been duly issued and were then outstanding, and the only default alleged was in the payment of one semiannual installment of interest which matured March 1, 1915, amounting to $1,250,000. The prayer, so far as it related to the appointment of a receiver, was substantially that a receiver be appointed to take possession of and to operate the properties of the Western Pacific Railway Company which are subject to the lien of the first mortgage, and to collect and receive the earnings, revenues, rents, issues, profits, and other income thereof, and to apply the net income thereof to the benefit of holders of bonds secured by such first mortgage as provided by the terms thereof, and with such other power and authority and with limitations of power and authority as to the court should seem proper.

The complaint was filed on the 2d of March, 1915. On that day

the Western Pacific Company, then the only defendant, by answer admitted all the allegations of the complaint, and on the following day the District Court appointed two receivers, who were duly qualified and are still acting. The court made them receivers of all the property of the Western Pacific Railway Company, and directed them to protect title, take possession, to continue operation, to prosecute all such suits as may be necessary in their judgment for the protection of the property and trust vested in them, and to appear and conduct the prosecution or defense of any suit then pending in any court against the Western Pacific Railway Company, or any company operated in the interests of said railway company, where, in the judgment of the receivers, it was necessary for the proper protection of the property placed in their charge for the interests and rights of creditors. March 30, 1915, the Equitable Trust Company, through the trustee, filed its amended bill against the Western Pacific Company, and averred substantially the things contained in the original bill.

On October 25, 1915, Central Trust Company of New York, which had become a party to the suit by intervention, filed its answer and cross-bill. Thereafter a stipulation was made by Central Trust Company consenting to a decree of foreclosure and sale, so that it is not very important to state the contents of the cross-bill, other than that it alleged that Central Trust Company is the trustee under the second mortgage of the Western Pacific Railway Company, this second mortgage covering all the properties of the Western Pacific Company, but is subject and subordinate to the first mortgage; that under the second mortgage there are outstanding bonds, aggregating in par value $25,000,000, which bear interest at 5 per cent. per annum; and that under the terms of the second mortgage, and because of the order appointing receivers of the property of the Western Pacific Railway Company, the Central Trust Company became entitled to foreclose and collect the entire amount secured by its mortgage.

The Equitable Trust Company, as trustee, on November 1, 1915, answered the cross-bill of Central Trust Company, admitting the material averments of the cross-bill; and on November 22, 1915, the Western Pacific Company filed its answer to the cross-bill, admitting all the allegations thereof.

On January 13, 1916, the Equitable Trust Company filed its supplemental and second amended bill. The substance of the averments of this supplemental bill is that since the amended bill had been filed the defendant railway company had defaulted in the payment of a second installment of interest, $1,250,000, due September 1, 1915, that the trustee under the mortgage had declared the principal of the $50,-000,000 outstanding bonds to be due, and that that principal and interest were due and in default. It was alleged, too, that the Boca & Loyalton Railroad, Mercantile Trust Company of San Francisco, as trustee under its first mortgage, and Chester L. Hovey, as receiver of the property of the Boca & Loyalton Company, claimed an interest in some 3¾ miles of track of the Western Pacific Railway, and that such interest was subsequent to and inferior to the first mortgage of the Western Pacific.

The Western Pacific Company, the Boca & Loyalton Company, and the Central Trust Company filed their respective answers, admitting the allegations of the supplemental and second amended complaint. The Mercantile Trust Company of San Francisco, as trustee, and Hovey, as receiver, filed their answers, and asserted a priority over the lien of the first mortgage of the Western Pacific Company of the interest of the Boca & Loyalton Company in the 3¾ miles of track referred to. On March 6, 1916, the Equitable Trust Company filed and submitted to the court certain stipulations:

(a) Stipulation between the Equitable Trust Company, as trustee, and the Western Pacific Company and Central Trust Company, waiving the right to take testimony, admitting the truth of the facts set forth in the amended bill and in the supplemental bill, and as recited in a form for foreclosure decree and sale attached to the stipulation, and consenting to the entry of such decree forthwith, or at the time of any such early hearing as the court should assign.

(b) Stipulation between the Equitable Trust Company, as trustee, and Boca & Loyalton Railroad Company, Mercantile Trust Company of San Francisco, as trustee, and Chester L. Hovey, as receiver, that a decree of foreclosure and sale might be entered forthwith, provided that it should contain a provision that such sale should be made subject to all then existing rights of such defendants to a trackage right over the 3¾ miles of track heretofore alluded to.

(c) Stipulations by the Southern Pacific Company and Utah Fuel Company, claimants against the Western Pacific Company, who had presented their claims as preferred claims, and whose claims had not been paid, consenting to the entry of a decree of sale in accordance with the prayer of the amended bill and the supplemental and amended bill, and consenting to the setting of the cause for hearing.

Counsel for the Equitable Trust Company, as trustee, moved the court for a decree of foreclosure and sale in the form submitted, or that, if such motion be denied, the cause be set for hearing, and for the entry of such decree at such early day as the court should assign. No party to the cause objected, but the receivers protested. The court allowed them to offer evidence, and over the objection of plaintiff's counsel continued the hearing until March 16, 1916.

With these motions counsel for the trustee submitted two affidavits—one made by the solicitor for the trustee, setting up the consent of all parties that a decree of foreclosure and sale should be entered forthwith, and that all creditors whose claims had been presented and allowed had been paid in full, and another made by counsel for the reorganization committee of holders of first mortgage bonds of the Western Pacific Company, setting up that on May 1, 1915, a bondholders' protective agreement had been framed; that on December 15, 1915, the holders of more than $37,000,000 of such bonds had deposited them under the agreement, and on that date a plan and agreement for reorganization had been framed under which the holders of more than $43,000,000 of bonds had deposited them; that in order to procure the underwriting required by such plan and agreement for the sale of $20,000,000 principal amount of bonds to be issued there-

231 F.—37

under the committee had procured an undertaking of certain bankers to secure an underwriting syndicate agreement; that the undertaking had been performed, and that by the terms of the plan and agreement it must be declared operative before March 15, 1916; that by the terms of the underwriting agreement that agreement expires July 1, 1916; that in order to carry out the plan and agreement it is necessary that the properties covered by the Western Pacific Company's first mortgage should be sold and steps necessary for the enjoyment of the underwriting agreement should be taken before July 1, 1916; that if delay in the entry of a decree of foreclosure and sale should be had the bondholders who were parties to it must become liable for various large sums for underwriting, commissions, and expenses; that the plan provides for the making of large extensions of the railroad out of the fund provided to be raised by the bond issue, and that if the plan should fail the money can be again had only upon less favorable terms, if at all; and that it is unnecessary that the receivership should be continued. To this affidavit were attached copies of the protective agreement, the plan and agreement for reorganization, and the underwriting syndicate agreement.

Certain other matters may here be stated:

On May 18, 1915, the receivers petitioned the court for six months' time within which to investigate and report to the court concerning matters and things in connection with certain contracts, including what is designated as "Contract B," and that pending examination of such contracts they might be effective without prejudice. The court ordered that a hearing upon the petition be had upon June 14, 1915.

Contract B was made on June 23, 1905, the same day upon which the first mortgage of the Western Pacific Company was executed. The parties to it were the Denver & Rio Grande Railroad Company (called the Denver Company) and the Rio Grande Western Company (called the Western Company), as parties of the first part, Western Pacific Railway Company (called the Pacific Company) as party of the second part, and Bowling Green Trust Company, as trustee under the first mortgage of the Western Pacific Railway Company (called the trustee), as party of the third part. The Equitable Trust Company of New York is successor to Bowling Green Trust Company as trustee under the first mortgage of the Western Pacific Railway Company, and the Denver & Rio Grande Railroad Company and the Rio Grande Western Railway Company are now consolidated into the Denver & Rio Grande Railroad Company.

Contract B recites: That the Denver Company operates a railway line from Denver, Colo., westerly to Grand Junction, Colo., at which point it connects with a railway operated by the Western Company from Grand Junction, Colo., westerly via Salt Lake City, Utah, to Ogden, Utah, connecting at Salt Lake City with the railway of the Pacific Company; that the Pacific Company has partially constructed, and is constructing the remainder of, a railway from San Francisco easterly to Salt Lake City, at which point the portion already constructed connects with the railway of the Western Company; that the Denver Company owns substantially all the stock of the

Western Company, and the Denver Company and the Western Company together own a majority of the authorized stock of the Pacific Company; that there is no line of railway which furnishes an outlet for either the Denver Company or the Western Company to the Pacific Coast that is not controlled by a competitor; that the Pacific Company has authorized an issue of $50,000,000 bonds for the purpose of completing and equipping its railway, interest upon which at 5 per cent. per annum is to be payable semiannually on the 1st days of March and of September, and to secure the payment thereof has authorized its first mortgage to the trustee upon its railway property, owned or to be acquired, and upon its said line of railway, and by said mortgage has covenanted to create a sinking fund to consist of $50,000 to be paid to the trustee during the year beginning September 1, 1910, and each year thereafter until the bonds shall be wholly paid; that the Pacific Company intends to pledge its interest under the agreement and to make the benefits to be derived therefrom a part of the security provided by the mortgage, to the end that it may be enabled to sell its bonds at a higher price than it could if the agreement were not so subordinated and pledged; that the railways owned and operated by the respective railway companies, parties to the contract, shall be operated as a joint through line for all purposes; that the Denver and Western shall turn over to the Pacific Company certain traffic; that whenever the Pacific Company shall not have sufficient freight equipment to perform its part in the operation of these three railways as a joint transportation system, the Denver Company and the Western Company shall furnish such additional cars as shall be required; that the Denver Company and the Western Company jointly and severally shall purchase semiannually demand promissory notes of the Pacific Company, to the amount by which the gross earnings and income of the Pacific Company during the preceding fiscal half year shall be insufficient to meet the sum of operating expenses, taxes which may become liens, interest falling due upon the Pacific Company's $50,000,000 first mortgage gold bonds during the then current half year, the Pacific Company's annual contribution to the sinking fund provided for in its first mortgage, any other charges or expenses that the Pacific Company shall necessarily pay to continue operation of its property and to protect unimpaired the lien and priority of its first mortgage, and interest upon all indebtedness of the Pacific Company other than its first mortgage bonds.

Without reciting the many provisions in detail, among other covenants material to the present controversy, we give the substance of these:

The payments made to the trustee as provided in a later paragraph shall be credited as payments of the purchase price of promissory notes of the Pacific Company, to be purchased by the Denver and Western Company.

The Denver and Western Companies covenanted that they would semiannually pay unto the trustee out of the purchase price of the notes such amount as, together with the amount actually appropriated by the Pacific Company out of its earnings and other income and by

it paid over to its fiscal agent in New York or San Francisco for the purpose of paying the interest to fall due upon the Pacific Company's first mortgage bonds, would be sufficient to pay all such semiannual installments of interest, and an amount sufficient, together with the amount appropriated by the Pacific Company out of its earnings and other income and by it paid over to the trustee for the purpose of meeting the sinking fund payment, to meet the sinking fund payments for the current half year.

The parties of the first part were to pay to the trustee under the first mortgage of the Pacific Company amounts required to be paid by them pursuant to the provisions of certain sections of the contract to supply, with the amounts paid by the Pacific Company, sufficient to pay the semiannual interest on the first mortgage bonds of the Pacific Company as such interest might fall due, and such additional amount as, with the amount already paid to the trustee by the Pacific Company for that purpose, would make up the full amount of payment for the sinking fund in accordance with the first mortgage requirements; and it was covenanted that all amounts payable to the trustee under the agreement to cover interest should constitute a trust fund for the payment of interest due, or thereafter to become due, upon the Pacific Company's first mortgage bonds, and should be by the trustee made available for the payment of interest upon said bonds as they should mature and payment be demanded. It was agreed that neither the Pacific Company nor any one claiming under them, save such persons as may be entitled to receive the interest on the first mortgage bonds, should be entitled to or possess any interest in, lien upon, or claim upon said fund or any part thereof.

The Denver and the Western Companies waived any right to demand the delivery of the promissory notes to be purchased before or coincidently with the payment by them, with the purchase price of any such notes as provided for, and agreed that they will promptly pay the purchase price of all notes that they are obliged to take, although the Pacific Company may not have taken steps necessary to deliver such promissory notes; but neither the Denver nor the Western Company, by reason of making such payments prior to the receipt of the notes, should be prejudiced in the right to receive or enforce the delivery by the Pacific Company of such notes.

The Pacific Company covenanted that it would construct its railway as contemplated and arrange with respect to traffic as provided, and make trackage agreements and operating rules, all as provided for; that it would make the promissory notes provided for, to be sold to the Denver Company; that the Pacific Company shall apply all its gross earnings and income to the payment of its operating expenses, its taxes, and to protect unimpaired the lien of its first mortgage, the interest on its bonds, its annual contribution to the sinking fund provided by its first mortgage, and any other charge or expense which it may be necessary for it to pay in order to assure the continued and efficient operation of its property and to protect the priority of its first mortgage.

The Pacific Company further covenanted that it would pay at cer-

tain times to its fiscal agents the installments of interest upon its mort-gage bonds, and cause its fiscal agents to pay all moneys over to the trustee, and pay to the trustee moneys to be paid under the sinking fund payment, as required by the first mortgage. The trustee under contract B agreed that it would hold all moneys received by it pursuant to the provisions of contract B in trust for and would apply the same to the purposes prescribed, and for the uses named in the contract, and that it would from time to time, upon request of any holder or holders of bonds, secured by the first mortgage of the Pacific Company, acting alone or with the Pacific Company, take steps to enforce by a suit or suits in equity or at law, or by other proper proceedings, to be prosecuted or taken in its own name, or in the name of the Pacific Company, or in the name of both, all the terms and provisions of article II of the agreement that require any payments to be made to the trustee by the parties of the first part, or either of them, and that upon request of the holder or holders of 20 per cent. in amount of the first mortgage bonds outstanding would likewise enforce any and all other provisions of the agreement as provided in article VI of the contract.

Article VI of contract B was a mutual agreement by and between the parties to the instrument, each severally agreeing with each and all of the others. Included in such covenants were these:

The trustee shall give notification in the amount of moneys held by it for the purpose of paying interest under the terms of the first mort-gage bonds at prescribed times, and the amount applicable as provided in the contract shall be equal to the difference between the amount so required, less the amount so held by the trustee, as shall on the date of the notice actually have been paid by the Pacific Company to its fiscal agent for the purpose of making such payment of inter-est, and the trustee shall at a certain time notify the parties of the amount held by it to be paid to the sinking fund payment as required by the terms of the mortgage, and the amount of moneys to be paid by the Pacific Company, applicable to the making of the sinking fund payment as required in the agreement, shall be the difference between the amount so required and the amount so held by the trustee. It was provided that failure on the part of the Pacific Company to per-form the covenants of the agreements shall not excuse the Denver and Western Companies from fulfilling their obligations; but if they should fail the Pacific Company may resort to suit for specific performance or action for damages as may be appropriate, but nothing shall be taken to authorize any action which may impair in any manner the lien or security of the first mortgage of the Pacific Company or pre-venting or interfering with the exercise of any of the remedies there-by granted to the trustee, and time is of the essence in all the covenants to be performed by the Pacific Company with relation to payments.

It is expressly covenanted that the agreement should be in force and binding upon all parties until all of the $50,000,000 first mortgage bonds shall be fully paid, principal and interest, as provided in the first mortgage of the Pacific Company, and that the agreement—

"shall run with the railways of the said several railway companies, parties hereto, into whosoever hands the same may come; and this agreement and the provisions thereof shall be so construed that any person or persons, corporation or corporations, which may at any time acquire in any manner any of the said several railways of the parties hereto shall be held and be deemed to have expressly agreed by virtue of the act or acts, deed or deeds, or other instrument or transaction, * * * to observe and perform all of the terms required by this agreement to be performed or to be observed by the party hereto from whom, immediately or indirectly, the said person or persons, corporation or corporations, may have acquired the said railways or railway, and the said person or persons, corporation or corporations, * * * shall be held to be bound by an express contract with the parties hereto and by and upon an express trust to perform and observe as aforesaid all the terms hereof, including all acts and things that may be necessary to preserve in full force the several obligations and agreements herein established or contained for the full term hereof."

The obligations and provisions of the contract are also expressly deemed to be a part of the consideration of any contract or contracts by which any person may acquire or undertake to acquire the said several railways or any of them. Each of the railway companies covenants with all the other parties that, if at any time during the continuance of the agreement it shall in any way transfer its property or rights and franchises to any of the premises affected by the mortgage, any instrument shall contain a covenant that it is made subject to all the provisions of contract B, and that the grantee or transferee, and any person claiming under such grantee or transferee, shall, by the acceptance of such instrument and the acceptance of such grant or conveyance, become bound to perform and observe all of the terms required by the contract to be performed and observed by the party making such grant or conveyance, including all acts and things which may be necessary to preserve in full force the several obligations and agreements established and contained in the contract.

Among the mutual covenants is a provision that in the event of default by the Pacific Company under its first mortgage the trustee shall forthwith become vested with the right, upon written request of the holders of two-thirds in amount of outstanding bonds secured by the mortgage, to terminate the agreement; "but such termination of this agreement shall not be deemed to and shall not release, nor shall anything else done hereunder release, the rights of the trustee or of the holders of the first mortgage bonds of the Pacific Company to the benefits of the agreements of the railway companies, parties of the first part, to make the payments" provided for in paragraphs 4 and 5 of article II.

The concluding clauses of the contract are that "the pledge to the trustee of all the rights, benefits, and advantages to which the Pacific Company may be entitled hereunder contained in said first mortgage of the Pacific Company is hereby assented to, ratified, and confirmed," and it was expressly agreed that the interest of each and all the parties to contract B should be subject and subordinate in any and every respect to the first mortgage of the Pacific Company.

The mortgage made by the Western Pacific Company transferred and assigned to the trustee as security all the property of the West-

ern Pacific Company then owned or thereafter to be acquired by the Western Pacific Company. Among the properties specially included in the mortgage were the rights which the Western Pacific Railway Company then owned or should acquire in contract B, which was described. Upon default, the mortgage provided for sale by the trustee by public auction or sale under judicial proceedings of all and singular the mortgaged property held by the trustee. This exception appears:

"Except only the right of the trustee and of the holders of the bonds secured hereby under said agreement between the Denver & Rio Grande Railroad Company, the Rio Grande Western Railway Company, Western Pacific Company, and Bowling Green Trust Company to require said two first-named companies and each of them to make any payment or payments of money to the trustee, and to recover damages, from said companies or either of them in default of any such payment or payments, which said rights and all rights secured by said agreement necessary for the enjoyment and enforcement of such rights shall remain in and survive to the trustee for the benefit of the holders of the bonds secured hereby, after and despite any and every sale made by virtue of this indenture, whether under the power of sale hereby granted and conferred or pursuant to judicial proceedings."

Among the provisions of the mortgage with respect to delivery upon completion of any sale to the trustee of all agreements held by the trustee and sold to the purchaser under proper assignments, we find this language:

"Provided, however, that so long as the Denver & Rio Grande Railroad Company and the Rio Grande Western Railway Company, or either of them, shall, by the terms of their said agreement with the railway company and the trustee, be under obligation to make any payment or payments to the trustee either for the purpose of providing funds wherewith to make payments of interest upon the bonds secured hereby or wherewith to make any payment into the sinking fund hereby provided for, the trustee shall not deliver said last mentioned agreement to any such purchaser or purchasers, although such purchaser or purchasers may have succeeded to any or all the interests and rights of the railway company thereunder."

And, further, that:

"After any sale or sales, whether under the power of sale hereby granted or pursuant to judicial proceedings, any and all moneys that may be received by the trustee under the provisions of said agreement between the Denver & Rio Grande Railroad Company, the Rio Grande Western Railway Company, Western Pacific Railway Company, and Bowling Green Trust Company, intended to provide the trustee with moneys wherewith to pay interest upon the bonds secured hereby, shall forthwith be applied by the trustee to the payment pro rata of the interest upon such of the bonds secured hereby as shall then remain unpaid in whole or in part, whether or not the same shall have been reduced to judgment; and any and all moneys that may be received by the trustee after any such sale or sales, under the provisions of said agreement intended to provide the trustee with moneys wherewith to make payments into the sinking fund hereby established, shall forthwith be applied by the trustee to the payment pro rata of the amounts remaining due for principal and interest upon the bonds secured hereby and then unpaid in whole or in part."

On March 26, 1915, the Equitable Trust Company of New York, as trustee, began suit in the United States District Court for the Southern District of New York against the Western Pacific Railway Company by filing an ancillary bill to the original bill filed here in California in the District Court. The District Court in New York appointed the same receivers of the properties of the Western Pacific

in that jurisdiction as the District Court had appointed here in California.

On the 27th of May, the Equitable Trust Company, as trustee, also filed in the District Court of New York what it denominated its ancillary dependent action in equity against the Denver & Rio Grande Railroad Company, Western Pacific Railway Company, and certain other fictitiously named defendants. This bill sets forth the agreement of the Denver .Company as contained in contract B, the default of the Western Pacific and the Denver Company with respect to interest payment upon the first mortgage bonds of the Pacific Company, due March 1, 1915, and the default of both companies in payments under the sinking fund requirements under the first mortgage; that it was agreed that the obligations under contract B should run with the respective railroads; that suits in foreclosure of the Western Pacific Company's first mortgage have been commenced in California, and that jurisdiction has been had by ancillary suits in Utah and New York; that the principal of the first mortgage bonds would soon be declared to be due; that a sale of the mortgaged properties would be had at an early day; that in all probability such sale would realize an amount less than the amount of bonds secured by the mortgage, principal and interest; that the Western Pacific Company was insolvent; and that recourse must therefore be had to the Denver Company for the payment of the debt. Apparently the theory of the bill was that the amount of the liability under contract B of the Denver Company to the trustee was perhaps only the amount of the difference between the earnings of the Western Pacific and the amount required for interest and sinking fund. At all events, plaintiff in its bill asked for the true meaning of the contract in respect to the sinking fund payments.

An account of earnings of the Western Pacific Company from the time of the creation of the first mortgage until the time of such accounting is asked for, and adjudication is prayed that the amount required to be paid or to be secured to be paid by the Denver Company in fulfillment of its obligations under the contract be had. The prayer asked for a construction and effect of contract B with respect to the provision that the agreement "shall run with the railways of the several companies named therein," and that the provision be enforced as against the new Denver Company, in accordance with the meaning as decreed by the court. The further prayer was as follows:

"That in respect to the amount found, upon the accounting and adjudication hereinbefore prayed for, to be due from the old Denver Company either under the said contract B or under the said guaranties, the court decree and direct the payment thereof by the new Denver Company by a short day to be named by the court; that upon the failure of the new Denver Company to make such payment accordingly, the amount thereof be by the decree of this honorable court charged upon the property of the new Denver Company, and that all and singular the property and effects of the new Denver Company be sequestered in aid of the said decree and in order to the enforcement and satisfaction thereof; that, in the same event, a receiver or receivers be appointed by the court to take possession of the railways and other property and franchises of the defendant the new Denver Company, and the earnings, income, and proceeds thereof, with power to operate the said property, and with all such powers and authority as may be required to preserve the same until the sale thereof, as the same may be decreed and ordered by this honorable

court, and to secure the earnings of such railroad property and franchises to the use of your orator and of the holders of said first mortgage 5 per cent. thirty-year gold bonds of the Western Pacific Company."

On June 4, 1915, the receivers petitioned the District Court in California for instructions in respect to contract B. On June 9, 1915, hearing upon this petition was had, and on June 10th the court of its own motion directed that the Equitable Trust Company, as trustee, show cause why the dependent suit in New York should not be dismissed or its prosecution stayed by the trustee until the further order of the court. And the court restrained the trust company, trustee, from taking any further step of any nature in the New York suit until the return day of the order made here in California. On June 28, 1915, argument was had before the District Court in California, the receivers appearing by their counsel and the trust company appearing by its solicitor. On February 21, 1916, the court enjoined the Equitable Trust Company from further proceeding with its dependent suit in New York, and from bringing any further action or proceeding involving contract B, and from taking any steps which might impair the obligation of any of the provisions of contract B without first obtaining leave of the court in California, and ordered that the Denver & Rio Grande Railroad Company and the Missouri Pacific Railroad Company be made parties to the suit, and be compelled respectively to interplead, and to set up any rights which they or either of them might have in the suit.

The Equitable Trust Company has appealed to this court from the injunctive part of the order of the District Court just referred to, and it also applies for a writ of prohibition to prevent the District Court from compelling the Denver & Rio Grande Railroad Company and the Missouri Pacific Railroad Company to interplead in the foreclosure suit.

Writ of mandamus is also asked directing the District Court to grant the motion of the plaintiff made when the stipulations heretofore referred to were filed to enter foreclosure decree. To this petition answer is filed.

There are also before us petitions to intervene in opposition to the issuance of the writs of mandate and prohibition as asked for. They set up that the Savings Bank & Trust Company of San Francisco owns 125 and represents the holders of 575 additional first mortgage bonds of the Western Pacific; that on March 13, 1916, it filed petition in the United States District Court of California for leave to intervene in the suit there pending between the Equitable Trust Company, trustee, and the Western Pacific, in which the order of injunction heretofore referred to was made; that the District Court ordered the petition to be heard on March 20th, a date subsequent to the hearings before this court.

The petitioners' position is, substantially, as follows: As minority bondholders they are not satisfied with the plan of reorganization. They say contract B creates an equitable lien on the Denver Railway as of the date of that contract, June 23, 1905, and that such lien is ahead of certain outstanding refunding bonds (over $33,000,000 in

amount), issued by the Denver & Rio Grande Railroad Company on August 1, 1908, and ahead of $10,000,000 of certain outstanding adjustment bonds issued by the Denver & Rio Grande Company in May, 1912. It is argued that, if contract B has created an equitable lien as of its date, the earnings of the Denver Railroad will be enough to pay the interest upon the Western Pacific Railway bonds until the principal is fully paid in as provided in contract B, but not quite enough to pay the interest on all the refunding bonds and all the adjustment bonds; but, if no equitable lien exists, then the earnings of the Denver are insufficient to pay its refunding and adjustment bonds and the Western Pacific bonds. Petitioners insist that contract B is an equitable lien and that a decision that it is must vitally affect the value of their Western Pacific bonds. They aver that the Equitable Trust Company, as trustee, is not insisting that there is such an equitable lien, and that the trustee is not using all proper efforts to protect the rights of the bondholders of the Western Pacific; that the Denver Company should intervene in the foreclosure suit; that the trustee herein and the Western Pacific whose stock is owned by the Denver and the Central Trust Company, trustee, for the second mortgage bondholders, the bonds being owned by the Denver Company, and the Boca & Loyalton, whose stock is owned by the Denver Company, all consenting to decree, are really the Denver Company.

The complaint in intervention enters upon some history of the bond issue of the Denver Company, and of the sales of the first and refunding bonds of that company through the medium of certain bankers in New York, and alleges that the Denver Company made a trust deed to secure its first and refunding bonds, and that such deed of trust referred to contract B, thus giving the parties notice; that in 1912, the Denver Company made another deed of trust and another mortgage to secure its adjustment bonds, amounting to $10,000,000; that the adjustment and refunding bonds issued by the Denver Company were negotiated through certain bankers named; that the same bankers who negotiated these bonds initiated the reorganization scheme of the Western Pacific and the Denver & Rio Grande; that the nonpayment by the Denver Company to the Western Pacific of the interest due by the Western Pacific in March, 1915, and the consequent default, and the filing of the foreclosure suit with the application for the appointment of a receiver immediately followed; that the bondholders' protective committee is the same as the reorganization committee; and that in the plan to create a holding committee the members of the reorganization committee will be on the board of directors of the operating corporation of the plan.

It is alleged that the bankers interested in the reorganization scheme caused the institution of the present suit, and the institution of the suit in the United States District Court in New York; that in the New York suit the Bankers' Trust Company, trustee under the mortgage securing the first and refunding bonds of the Denver Company, and the New York Trust Company, trustee under the mortgage securing the adjustment bonds of the Denver Company, were not made parties; that in the New York suit the Equitable Trust Company, trustee, did

not ask the court to declare that the obligation of the Denver Company under contract B would be a lien prior to the rights of the holders of the Denver Company's first and refunding bonds or its adjustment bonds; and that if the New York suit is allowed to proceed the rights of the interveners and other holders of the first mortgage bonds of the Western Pacific will be imperiled and lost, and the result will be that the bonds of the interveners would be subordinated to certain first and refunding bonds and adjustment bonds of the Denver Company, all of which were issued through the medium of certain named bankers, who, it is alleged, caused the bringing of the suit. Interveners also allege that the Equitable Trust Company by its course in the foreclosure proceeding involved in this appeal, and its course in proceeding in the New York suit have been against the interests of the first mortgage bondholders of the Western Pacific, and that the Denver Company is endeavoring to obtain a decree reversing the order of the District Court herein appealed from, to the end that it may proceed in New York with its litigation, which will be injurious to the interests of the bondholders; that the plan for reorganization is intended to operate to the advantage of the Denver Company, by enabling the reorganization committee to purchase at the foreclosure sale of the properties of the Western Pacific all the properties of that company covered by the first mortgage at a price which the committee deems proper; and that the claims of depositing bondholders against the Denver Company will be turned over to the reorganization, and that nonassenting bondholders will receive only their distributive share of the proceeds of the sale of the property, the intention being apparently to deprive the nondepositing bondholders of their claims against the Denver Company on account of contract B; that neither the Denver Company, nor the Bankers' Trust Company, nor the New York Trust Company has consented to the decree of foreclosure against the Western Pacific, and if the properties of the Western Pacific are sold and the proceeds applied upon a judgment, and the judgment docketed against the railway company, if deficient, that the Denver Company, the Bankers' Trust Company, and the New York Trust Company may claim that the obligation of the Denver Company under contract B has been extinguished.

The prayer of the interveners is that the true meaning of contract B in respect to the obligations of the Denver Company to the Western Pacific and to the trustee and to all holders of first mortgage bonds be declared; that the court order the Bankers' Trust Company, and the New York Trust Company, and the trustees under the bond and mortgage of the Denver Company, to be brought in as parties, and the rights of interveners and of holders of first mortgage bonds of the Western Pacific, and of the trustee under contract B, and of the Western Pacific and the Denver under contract B, be determined, and that a lien be adjudged upon the railroad and property of the Denver Company as of June 23, 1905, and be held superior to any mortgage or lien of the Denver Company and the Bankers' Trust Company, as trustee, in refunding bonds of the Denver Company; and that it be declared a lien ahead of the adjustment bonds of the Denver Company,

and that no sale of the Western Pacific property be granted until the Denver Company and the Bankers' Trust Company and the New York Trust Company shall become parties to the suit, and shall enter into an agreement protecting the interests and claims of the interveners and first mortgage bondholders of the Western Pacific. Further prayer is that, before ordering any sale of the properties of the Western Pacific, the court take evidence with respect to the value of the Western Pacific and fix an upset price below which the commissioner making the sale will not be permitted to receive a bid for said properties, and that the upset price be high enough to protect properly the interests of interveners and of first mortgage bondholders not parties to the plan of reorganization.

[1] From the statement just made it appears that on March 1, 1916, as between the parties to the suit in foreclosure, there was but one disputed issue before the court. That controverted issue involved the right of the Boca & Loyalton Railroad Company in the three and a fraction miles of the Western Pacific Railway Company, sole defendant, to survive foreclosure of the first mortgage of the Western Pacific. But inasmuch as this matter was settled or adjusted between the parties to the suit before the decree was asked, it is unnecessary to dwell upon it at greater length. The parties to the suit were all agreeable to a decree in foreclosure, and upon the showing made by affidavit and pleadings before the court we think were entitled to have the case proceed with convenient expedition, unless some matter arose which called for inquiry and delay. We say this because the affidavits presented to the court disclosed that the relief which the trustee asked for in behalf of the mortgage bondholders could only be wholly effectual by prompt judicial enforcement of the rights of the trustee. As already shown, among the circumstances put before the court were that holders of more than $37,000,000 of first mortgage bonds had deposited their bonds pursuant to a plan of reorganization under which an underwriting for the sale of $20,000,000 principal amount of bonds were to be issued by the purchaser at the sale; that the undertaking had been performed, and that under the plan and agreement it must be operative before March 15, 1916, and would expire July 1, 1916; that to make the plan effective the properties of the Western Pacific must be sold, and such steps must be taken as would allow the benefits of such agreement to be taken before July 1, 1916, and that if the plan should fail by reason of delay in foreclosure decree and sale the bondholders who are parties to the agreement will be liable in large sums for underwriting and expenses; that the plan contemplated heavy expenses for railroad extensions out of the funds to be raised, and that it will be unnecessary to carry on the receivership. In critical examination of contract B it must be borne in mind that it was made contemporaneously with the mortgage of the Western Pacific and is to be construed accordingly. It had as a main purpose inducement to first mortgage bondholders, for it scarcely needs suggestion that with its existing provisions the bonds of the Western Pacific would bring higher prices in the financial markets than would an issue of bonds without such assurances.

[2] There appear to be separable covenants in the whole contract: One, wherein the Denver Company agrees to pay to the trustee of the first mortgage bonds an amount which, when added to the money actually paid by the Pacific Company, is enough to pay the interest and also the sinking fund as may be due. Another, where the Denver Company covenants to lend to the Western Pacific such an amount as will, when added to the net earnings of the Western Pacific and without including interest on bonds, enable the Western Pacific to make its interest payment. As a way of effecting this, the Denver Company was to pay the amounts to the Western Pacific, the Western Pacific was to give its note to the Denver, and then the Western Pacific would make the payments. Such a mode of procedure would result in this: The Western Pacific could not call on the Denver to make payments until it had applied its earnings to pay, but the secured mortgage bondholders could demand that the Denver pay, no matter what the conduct of the Western Pacific may have been respecting application of its earnings.

[3, 4] Another important general subject in contract B is that of traffic. The Western Pacific was to secure advantage in traffic to the East via Colorado points. But we can pass the details of this feature of the contract, because they are not vital to the questions here under consideration. It is clear, however, that the mortgage covered all the traffic rights of the Western Pacific as they are defined in contract B. But the rights vested in the trustee with respect to the enforcement of the suretyship of the Denver were reserved to the trustee. With those several features of the contract which pertain directly to operation and traffic, the trustee has less direct obligation, although it could terminate the traffic agreement under certain conditions. They were the property of the Western Pacific, and were to be carried out primarily at least by the railroad; but with the money matters affecting payments upon bonds the trustee is to deal directly, and is the party in interest and authorized to bring suit to enforce the rights accruing to it as beneficiary.

Contract B is, in its obligations upon the Denver Company, so explicitly kept alive for the benefit of the bondholders that provisions safeguarding and making certain the money payments are reiterated and the agreement shall (unless abrogated as therein expressly provided) "endure until all the first mortgage bonds of the Pacific Company shall be paid, and shall run with the railways of the said railway companies, parties to it, into whosoever hands they may come."

[5] It is not our intention to decide that the agreement made to run with the railways of the railroad companies created an equitable lien or charge in the nature of a lien which attached to the railway property of the Denver Company. The question whether or not it did create such a charge cannot and should not be adjudicated without affording to the Denver Company full opportunity to be heard. But we can safely say that it contains an obligation effective when the principal debt of the Western Pacific was not paid, and when default in payment of interest due by the Western Pacific occurred, and

when the Denver Company neglected or failed to live up to the obligations imposed upon it.

[6] The covenant of the Denver Company and of the Western Company to pay the trustee such amounts as will, with the amounts actually paid over for those respective purposes by the Pacific Company, be sufficient to meet the interest on the bonds secured and the sinking fund requirements, runs not solely to the Pacific Company; nor was its principal purpose to aid the Pacific Company to pay its obligations; nor is the trustee a mere custodian for the Pacific Company; nor are the moneys, when paid over to the trustee, assets of the Pacific Company in the same sense that its own earnings are. Far more reasonable a construction is it that under the covenants the trustee is the covenantee of a trust fund for the benefit of the bondholders secured under the terms of the first mortgage, and that the trustee, when it shall receive moneys turned over to it under the covenants, would apply them for the benefit of the bondholders.

Whether the covenants are strictly of suretyship, as distinguished from guaranty, are questions not appropriate for decision now. It is enough to say that, whether one or the other in the strictest sense, the trustee has a right to sue the Denver Company for a breach of its covenants for the payment of interest and monies due, and may properly exercise such right in its own name for the benefit of the first mortgage bondholders. The mortgage itself, specially referring to contract B in clear words, says that in case of default in payment of interest there is the right in the trustee to "sell at public auction all and singular the * * * obligations, contracts, agreements, and interests of every description" held by the trustee, or subject to the indenture, excepting only the right of the trustee and of the holders of the bonds secured by the mortgage under contract B, requiring the Denver Company to pay moneys to the trustee and to recover damages from the Denver Company upon default of such payments. This right and all rights secured by contract B necessary for the enjoyment and enforcement of such rights shall remain in and survive to the trustee for the benefit of the bondholders despite sale. When this undertaking by the Denver Company to pay the debt of the Western Pacific if it has not been paid by that company was unperformed, the trustee became a real party in interest, having full right to proceed by suit to protect the mortgage bondholders.

[7] It is undoubtedly correct that when the Pacific Company made its first mortgage it pledged all the assignable rights it had under contract B. The rights of the trustee under contract B are distinct from the rights of the Pacific Company. Those of the Pacific Company are included within the mortgage or pledge and can be sold under foreclosure. Those of the trustee to enforce under B are not included, and therefore cannot be sold. They remain in and survive to the trustee for the benefit of the first mortgage bondholders.

[8] The District Court in California was not asked to give relief against the Denver Company; nor was it asked to appoint receivers, except to protect and preserve, pending the litigation, the property subject to the mortgage lien, which did not include the right of the

trustee to enforce rights, herein involved, against the Denver Company, for it may be reiterated that was not to be sold under foreclosure, but was to survive to the trustee for the benefit of the bondholders. It comes, then, to this: The receivers had a right to the custody of only the property the subject-matter of litigation described in the amended complaint, and none other.

[9] We also believe that the trustee had a right to proceed with its dependent action in New York. Guardian Trust Co. v. Kansas City So., 146 Fed. 337, 76 C. C. A. 615. The Denver Company not being within this jurisdiction, and the District Court in California having no possession of any property except that of the Western Pacific in California covered by the mortgage, could not prevent the trustee from bringing action in personam against the Western Pacific in a jurisdiction where that corporation might be found. Should judgment be obtained, doubtless satisfaction from the property in the hands of receivers could not be had without the aid of the court having authority over the receivers. But that is outside of this dispute.

[10, 11] The Pacific Company may have a right to proceed upon the liability of the Denver Company; but that need not be considered, because if it has, notwithstanding its own default, and if the receivers may enforce such right, remedy lies not in the present action, but in suit in the nature of specific performance or by other plenary action to compel the Denver to pay to the trustee, that being the corporation designated to receive the money. We may assume there was an equitable lien given by contract B upon the property of the Denver Company, and still it could not avail to defeat the right of the trustee to foreclose without making the Denver a party to the foreclosure suit. The Denver Company has no property within this jurisdiction, and in the event of decree the court would be without authority to enforce a charge against its property.

[12] We would not in any sense lessen the power of a court of equity to protect itself against being made an instrument of injustice. It may appropriately, and should, scrutinize matters brought before it and which are fairly within and directly related to the issues presented. But its jurisdiction is always limited to the subject-matter in the case before it. In Reynolds v. Stockton, 140 U. S. 254, 11 Sup. Ct. 773, 35 L. Ed. 464, Justice Brewer approved part of the opinion of Chief Justice Beasley in Munday v. Vail, 34 N. J. Law, 418, who said:

"Jurisdiction may be defined to be the right to adjudicate concerning the subject-matter in the given case. To constitute this, there are three essentials: First, the court must have cognizance of the class of cases to which the one to be adjudged belongs; second, the proper parties must be present; and, third, the point decided must be, in substance and effect, within the issue. That a court cannot go out of its appointed sphere, and that its action is void with respect to persons who are strangers to its proceedings, are propositions established by a multitude of authorities. A defect in a judgment arising from the fact that the matter decided was not embraced within the issue has not, it would seem, received much judicial consideration. And yet I cannot doubt that, upon general principles, such a defect must avoid a judgment. It is impossible to concede that, because A. and B. are parties to a suit, a court can decide any matter in which they are interested, whether such matter be involved in the pending litigation or not. Persons, by becoming suitors, do not place themselves, for all purposes, under the control of the court, and it is only over these particular interests which they choose to

draw in question that a power of judicial decisions arises. If, in the ordinary foreclosure case, a man and his wife being parties, the Court of Chancery should decree a divorce between them, it would require no argument to convince every one that such decree, so far as it attempted to affect the matrimonial relation, was void; and yet the only infirmity in such a decree would be found, upon analysis, to arise from the circumstances that the point decided was not within the substance of the pending litigation."

The record shows that neither plaintiff nor defendant invoked the jurisdiction of the court as against the Denver Company, and that no question was before the court for adjudication except the right of the trustee to foreclose the mortgage of the Western Pacific.

[13, 14] Under the usual rule of the federal courts, if a case may be finally decided between the parties litigant without bringing others before the court, who would, generally speaking, be necessary parties, such parties may be dispensed with, if they are citizens of another state. This in no real sense conflicts with the principle that, if those not before the court have rights so closely related to the issues between the parties in court that a final decision cannot be made between them without affecting the rights of those not before the court, then the court may not dispense with such persons. California v. So. Pac., 157 U. S. 229, 15 Sup. Ct. 591, 39 L. Ed. 683. The citation from Beach on Equity Practice made by counsel in opposition to the plaintiff's appeal is very pertinent:

"Necessary parties are those who have an interest in the controversy, but whose interests are separable from those of the parties before the court, and will not be directly affected by a decree which does complete and full justice between them. Such persons must be made parties, if practicable, in obedience to the general rule which requires all persons to be made parties who are interested in the controversy, in order that there may be an end of litigation; but the rule in the federal courts is that if they are beyond the jurisdiction of the court, or if making them parties would oust the jurisdiction of the court, the case may proceed to a final decree between the parties before the court leaving the rights of the absent parties untouched, to be determined in any competent forum. * * * Indispensable parties are those who not only have an interest in the subject-matter of the controversy, but an interest of such a nature that a final decree cannot be made without either affecting their interests or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience."

[15] It is argued that equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) gave to the court power to order that the Denver be made a party. It provides that:

" * * * Any person may at any time be made a party if his presence is necessary or proper to a complete determination of the cause."

Having shown that the Denver was not a necessary or proper party to the cause before the court, the rule is inapplicable. Vaughan v. Black et al., 63 Mich. 215, 29 N. W. 523; Winsor v. Ludington, 77 Mich. 215, 43 N. W. 867.

[16] The receivers are not necessary parties to the appeal from the injunction issued. The record fails to show that the court acted upon any motion for injunction made by them. On the contrary, the learned District Judge remarked that the receivers stand indifferent as to how the litigation shall go. The order appealed from was made by the court, acting of its own motion, under the belief that it had power

to control and direct the trustee in respect to its actions in New York and elsewhere.

[17, 18] We may well doubt whether the petition in intervention has legal relevancy to the proceedings pending before us. But, passing that point, and regarding the theory of the application to intervene as resting upon the contention that contract B creates an equitable lien upon the properties of the Denver Company superior to adjustment and refunding mortgages issued by the Denver Company, there is nothing authorizing the court to infer that the trustee does not intend to do its duty and assert such a claim against the Denver Company after the foreclosure of the mortgage on the properties of the Western Pacific. Shaw v. Railroad Company, 100 U. S. 605, 25 L. Ed. 757. It is hardly conceivable that the trustee of so important a trust as is conferred upon the Equitable Trust Company will incur the liability which will come to it if it should be recreant in the performance of its obligations to enforce every right conferred by contract B for the protection of the first mortgage bondholders. We cannot here hold that an election by the trustee to enforce any rights that the mortgage bondholders may have under contract B against the Denver Company after foreclosure indicates infidelity to its trust. Possible controversies which may arise if it should be decided that contract B creates an equitable lien cannot be disposed of in this litigation. So plain do we think it that a failure to assert the claim of the trustee against the Denver Company on contract B and to reduce any such claim to judgment prior to foreclosure and decree is not fraudulent that we need not say anything more upon the point. And as we cannot see that a nonassenting bondholder in the plan of reorganization can be deprived of his full right to insist that an action be brought to enforce contract B, we fail to see how he can be injured by permitting the foreclosure proceeding to proceed. We are satisfied, however, that the District Court in its discretion has full power to make an order concerning an upset price upon the sale, if such procedure should be deemed desirable by the court; of course, hearing may well be accorded to these petitioners and such others as may appear to have any interest in the proceeding for the purpose of aiding the court in ascertaining and determining what the upset price should be.

Summarizing the principal points we conclude:

The receivers not being necessary parties to this appeal, the motion to dismiss the appeal must be denied.

The trustee, Equitable Trust Company, had a right to proceed to foreclosure as it prayed against the Western Pacific.

The Denver Company was not a necessary or proper party to such foreclosure proceedings, and the Denver Company not being within the jurisdiction of the court, and the court having no custody of its property, no order could be made compelling it to interplead in the foreclosure suit.

The trustee had a right to begin action against the Denver Company in New York to enforce any rights accruing under contract B to the bondholders, and the District Court in California had no power to interfere with the trustee in proceeding with such action.

[19] That part of the order which would compel the Denver Company and the Missouri Pacific Company to become parties to interplead having been in excess of jurisdiction, writ of prohibition is properly invoked. U. S. v. Mayer, 235 U. S. 67, 35 Sup. Ct. 16, 59 L. Ed. 129; McClellan v. Carland, 217 U. S. 268, 30 Sup. Ct. 501, 54 L. Ed. 762; In re Rice, 155 U. S. 396, 15 Sup. Ct. 149, 39 L. Ed. 198.

[20] We shall deny the petition for a writ of mandamus, because every presumption is that the District Court, being advised of the views of this court, will proceed to give the parties full measure of relief.

The order appealed from is reversed.

Petitioner's application for writ of prohibition is granted.

The application for writ of mandamus is denied.