EQUITABLE TRUST CO. OF NEW YORK v. WESTERN PAC. RY. CO.

SAME v. DENVER & R. G. R. CO. et al.

(District Court, S. D. New York.   May 17, 1917.)

1. RAILROADS ⚖=154—CONTRACTS—CONSTRUCTION.

The Western Pacific Railway Company, which owned a right of way, to provide for construction of its road, made an issue of bonds secured by a mortgage to complainant trust company as trustee. As a part of the same transaction a number of contracts were made. One of them, to which the Pacific Company, complainant, and two other railroad companies (afterwards merged in defendant company) were parties, provided that defendant should purchase the promissory notes of the Pacific Company each six months in such amounts, if any, as might be required, together with the earnings of the Pacific Company applicable thereto, to meet the maturing interest on the bonds and sinking fund payments required by the mortgage, the purchase money to be paid to complainant; that such obligation should run with defendant's road and the contract should remain in force until the principal and interest of the bonds were paid in full; also defendant waived execution of the notes in advance of such payments, and, being the owner of practically all of the stock of the Pacific Company, agreed to keep its stock issue sufficient to legalize the notes. *Held,* that the paramount purpose of such provisions was to pledge the credit of defendant as additional security to the purchasers of the bonds, and that the fact that default was made in the payment of interest, the mortgage was foreclosed, and all of the property of the Pacific Company sold, so that it could no longer execute valid notes, did not relieve defendant from liability to the trustee on the contract.

2. RAILROADS ⚖=154—CONTRACTS—CONSTRUCTION AND OPERATION.

The default in the payment of interest on the bonds which resulted in the foreclosure having been due to the failure of defendant to make the advances agreed upon, such failure constituted a repudiation of the contract which absolved the Pacific Company from the further delivery of notes thereunder.

3. RAILROADS ⚖=154—CONTRACTS—CONSTRUCTION AND OPERATION.

While the contract required the Pacific Company to apply all its gross earnings and income to certain specified purposes, including payment of interest and the notes given defendant, and provided that such covenant should run with its road into whosoever's hands it might come. it further provided that in case of default whereby a right of foreclosure should accrue, continuing for six months, the trustee might declare the principal of the debt due and sell all of the property of the Pacific Company, and might also terminate the contract, except those provisions by which defendant gave further assurances to the bondholders which should remain unaffected with the right in the trustee to enforce their specific performance. Such a default did occur, the mortgage was foreclosed, and all the property of the Pacific Company was sold, including its rights under the contract, but reserving those of the trustee, and the purchaser refused to assume any liability under the contract. *Held,* that such facts, under the clear terms of the contract and in view of the fact that defendant was

---

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in full control of the mortgagor, did not release defendant from the future performance of the obligations it assumed to the trustee for the benefit of the bondholders.

4. RAILROADS ⊙⟳154—CONTRACTS—VALIDITY—ULTRA VIRES.

The provisions of the contract by which defendant assumed obligations to the bondholders of the Pacific Company were not ultra vires, although they involved the purchase of notes before their issuance, taking into consideration the fact that defendant was virtually the owner of that company and in a position through stock control to enforce their issuance, and also the continued existence and operation of that company.

5. RAILROADS ⊙⟳154—CONTRACTS—BREACH.

At the time of its last payment to the trustee under the contract defendant, through its board of directors, caused a notice to be published in the public press, in effect that it would pay no more deficiencies of the Pacific Company unless the bondholders would consent to some arrangement by which their legal demands under the contract would be abated. No such arrangement having been made, it ceased making the payments, and at no time during the foreclosure suit did it manifest any intention of assisting the Pacific Company, although it owned five-sixths of the stock. *Held,* that such repudiation and subsequent action constituted a breach of the whole contract and gave an immediate right of action to recover full damages for the breach.

6. RAILROADS ⊙⟳154—CONTRACT OF GUARANTY—TERMINATION—DAMAGES FOR BREACH.

The contract, having provided that it should "continue in full force and effect until all of the bonds shall be fully paid, principal and interest," was not terminated by the acceleration by complainant of the maturity of the principal under the terms of the mortgage, but remained in force as to the deficiencies on installments of interest maturing before the sale of the property, after applying the earnings of the road, and thereafter as to the interest on so much of the mortgage debt as remained unpaid after the foreclosure sale, the amount to be determined by taking its present or actuary value.

7. RAILROADS ⊙⟳154—CONTRACT OF GUARANTY—MEASURE OF LIABILITY—VALUE OF PROPERTY ESTABLISHED BY FORECLOSURE SALE.

The price at which the property of the Pacific Company was sold at public auction must be accepted as establishing its value for the purposes of the contract, and defendant was not relieved from full liability on account of the balance remaining due on the mortgage debt by the fact that such price was the upset price fixed by the court on application of the majority bondholders or the fact that they became the purchasers.

8. INTEREST ⊙⟳28, 37(1)—RATE AFTER MATURITY OF DEBT.

On recovery of damages for breach of a contract to pay money the interest recoverable after default is governed by the law of the state of suit, and in New York the rate is the legal rate, regardless of the contract rate.

In Equity. Suit by the Equitable Trust Company of New York, as trustee, against the Western Pacific Railway Company, and same against the Denver & Rio Grande Railway Company and the Western Pacific Railway Company. Decrees for complainant.

See, also, 231 Fed. 478; 233 Fed. 335; 236 Fed. 813, 814.

This cause comes up upon final hearing on a dependent bill in equity, ancillary to a bill of foreclosure which was itself ancillary to an original bill in foreclosure depending upon diverse citizenship. On the 2d day of March, 1915, the plaintiff filed the original bill of foreclosure in the District Court of the United States for the Northern District of California against the Western

⊙⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Pacific Company for the foreclosure of a mortgage hereinafter mentioned, and on the 27th day of May, 1915, the ancillary bill of foreclosure was filed in this district for foreclosure of the same mortgage upon assets located in this district. This bill, which was filed on the same day, was to secure an adjudication upon a contract entered into between the defendant in the original bill, the Western Pacific Railway Company, the Rio Grande & Western Railway Company, the Denver & Rio Grande Company, and the plaintiff's predecessor in title. It was superseded by the filing of an amended and supplemental bill verified on the 4th day of January, 1917, and filed January 6, 1917, on which the hearing was had, and to which alone reference need be made.

The gist of the bill is that on June 23, 1905, the defendant Western Pacific Railway Company, a California corporation, executed a mortgage dated September 1, 1903, of all its assets to the Bowling Green Trust Company, a New York corporation, of which plaintiff is the successor. At that time the Western Pacific Railway Company had only acquired a right of way for a railway in the state of California, and the mortgage was for the purpose of an issue of $50,000,000 of 5 per cent. bonds due on the 1st day of September, 1933. In the year 1905 the predecessors of the defendant the Denver & Rio Grande Railway Company (known as the New Denver Company), which were two railroads, the Rio Grande & Western Railway Company and the Denver & Rio Grande Railway Company (known as the Old Denver Company), took up the question of purchasing the rights of the Western Pacific Railway Company and issuing a sufficient number of bonds under the aforesaid mortgage to construct the railroad therein contemplated. In pursuance of such purpose, and for the purpose of better securing bonds to be issued thereunder, the Old Denver Company and the Rio Grande & Western Railway Company entered into certain contracts with the plaintiff and with the Western Pacific Railway Company, known as contracts A, B, and C, the general upshot of which was that the Old Denver Company and the Rio Grande & Western Railway Company (called the Western Company) should acquire together one-half of the $50,000,000 of the existing stock of the Western Pacific Railway Company, and $25,000,000 added stock which was to be issued. The second of these contracts, known as contract B, made certain provisions touching the payment of interest and a sinking fund upon the first mortgage bonds of the Western Pacific Railway Company, hereinafter to be set forth in detail.

Under this contract some $47,000,000 of added bonds were issued to the public generally, and the mortgage of September 1, 1903, became effective to secure the same. These bonds all carried semiannual coupons, and the same were paid in part by the earnings of the Western Pacific Railway Company itself, and the balance by the defendant until March 1, 1915, at which time the Western Pacific Railway Company defaulted, and the defendant, who had meanwhile at its organization in 1908 assumed the engagements of the Old Denver and the Western Companies, failed to supply the necessary balance of funds to redeem such coupons. Thereupon the suit in foreclosure in California, as already stated, was commenced, and on the 18th of December, 1915, the default continuing, the trustee declared the whole principal of the bonds to be due in accordance with the provisions of the mortgage. The foreclosure suit proceeded to decree of sale, and the property of the Western Pacific Railway Company was struck off to a reorganization committee consisting of bondholders for the sum of $18,000,000. No deficiency judgment was taken, but the bid was assigned to a new railroad known as the Western Pacific Railroad Company, which declined to be bound by the contracts executed as aforesaid on the 23d of June, 1905.

The bill prays that contract B, on which the obligations of the defendant Denver & Rio Grande Railroad Company are asserted to depend, be construed, and that it be declared to constitute a charge and lien upon the railroad of the defendant the New Denver Company; that the court declare the amount due thereon and declare the same to be a charge on its assets; and for other incidental relief.

At the outset an order was obtained enjoining the New Denver Company from paying over certain moneys which were within the Southern district of New York, and this was also made the basis of the equitable jurisdiction of

this court. The question of the court's equitable jurisdiction, however, was not raised, as neither party desired a jury trial, and the case was heard upon the assumption that whatever relief plaintiff was entitled to, if any, should be awarded in this suit, regardless of whether strictly it had any equitable jurisdiction or not. It will serve no purpose further to detail the pleadings in the cause, but directly to proceed to a statement of the facts, which were either documentary or stipulated.

The Old Denver Company, a Colorado corporation, in 1905 operated a railroad from the city of Denver, Colo., westerly to the city of Crevasse, in Colorado, at which point it was joined by the Western Company, a Colorado and Utah corporation, which continued to Salt Lake City and Ogden, both in the state of Utah. The Old Denver Company owned all but a very few shares of stock of the Western Company, and for the purposes of this case the latter company need not be distinguished from the Old Denver Company. Indeed, in the year 1908 the New Denver Company, which is the defendant herein, was organized from the two and assumed their obligations, including specifically that arising under contract B here in question. These two roads had up to the year 1905 obtained a western outlet at Ogden and Salt Lake City by the Oregon Short Line with its terminus at Portland, and the Central Pacific with its terminus at San Francisco. In that year. however, owing to the acquisition by the Southern Pacific Railroad of the Central Pacific & Oregon Short Line, and the then existing legal incapacity of the Interstate Commerce Commission effectively to provide for the case, this outlet was abruptly cut off, and the earnings of the Denver Companies at once showed serious impairment. This made it a matter of final importance for the Denver Companies to procure a western outlet of their own, and the only feasible right of way then in existence, or indeed obtainable at all, was a substantially parallel right of way already owned by the Western Pacific Company, whose mortgage of September 1, 1903, had not yet been executed, although it had expended $3,000,000 in development. It was recognized as likely that more than the face of that mortgage, $50,000.000, would be necessary to complete the road, but in order to sell those bonds through the mediation of a bankers' syndicate, with whom negotiations had been opened, at a price of 92½, it was thought necessary to give some further security than the mere mortgage itself to the bondholders, and after various negotiations, which it is unnecessary to consider, as they were subsumed in the definitive contracts, a preliminary contract was entered into on the 22d of June, 1905, for the requisite security. This contract was between the two Denver Companies and the Western Pacific Railway Company, and provided that the Denver Companies should as further security at once execute to the Pacific Company three contracts: (a) An agreement by the Rio Grande & Western Company to purchase from the Western Pacific Railway Company $25,000,000 of second mortgage bonds at 75, these being correctly thought necessary to complete the line from Salt Lake City to San Francisco; (b) the contract here in suit; (c) a traffic contract between the Missouri Pacific Railway Company and the Old Denver Company providing for the maintenance of a joint line of transportation over their lines to the benefit of which the Western Pacific Railway Company should be entitled. The Western Pacific Railway Company on its part agreed to deliver to the Old Denver Company 100,000 full-paid shares of its stock, and to the Rio Grande & Western Company 150,000 shares of its stock, constituting one-half of its existing stock, and also to increase its stock from $50,000,000 to $75,000,000, all of which was to be distributed between the two Denver Companies.

On the next day the parties as part of a single transaction executed the mortgage and the three contracts mentioned in the contract of the day before of which it will be necessary, however, further to consider only contract B. To this contract the parties were the Denver & Rio Grande Railroad Company, therein called the "Denver Company," and the Rio Grande & Western Company, therein called the "Western Company," as parties of the first part, the Western Pacific Railway Company, therein called the "Pacific Company," party of the second part, and the Bowling Green Trust Company, the plaintiff's predecessor, therein called the "trustee." It was divided into six articles.

The first article defined certain terms to be used thereunder and formal matters not necessary to mention.

The second article provided for a traffic agreement between the Pacific Company and the Western and Denver Companies designed mutually to secure the shipment of freight from Denver to San Francisco and intermediate points, and then in sections 4 and 5 set forth certain engagements of the Denver and Western Companies, which are the crux of this litigation. These companies promise "to purchase semiannually beginning with the date hereof, except as otherwise expressly stated, promissory notes of the Pacific Company bearing interest at the rate of 5 per cent. per annum and payable on demand, to the amount of face value by which the gross earnings and income of the Pacific Company during the preceding fiscal half year shall be insufficient to meet the sum of the following: (1) Its operating expenses, including rentals payable under leases, and particularly any lease of terminals at Salt Lake City, also current payments upon claims for damages to persons or property, and its ordinary, including all necessary, expenses of maintenance; (2) its taxes, including all assessments and other governmental charges against it or that may become a lien upon any of its property; (3) from and after the 1st day of September, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, all interest falling due during the then current calendar half year upon the Pacific Company's fifty million dollars ($50,000,000), face value, of first mortgage 5 per cent. thirty-year gold bonds; (4) the Pacific Company's annual contribution to the sinking fund provided for in its said first mortgage, if the same be payable during the then current calendar half year; (5) any other charge or expense that it may be necessary that the Pacific Company shall pay in order to assure the continued and efficient operation of its property and to protect unimpaired the lien and priority of its said first mortgage; (6) any tax or taxes which the Pacific Company may be required by law or permitted to pay upon or deduct from the principal or interest of its said first mortgage bonds, so that the holders of such bonds shall, under all circumstances, receive the principal and interest thereof without deduction for any tax or taxes; (7) all interest for such current calendar half year upon all indebtedness of the Pacific Company, other than its said first mortgage bonds. Provided, however, that any payments made to the trustee as provided in paragraph (b) of this article shall be deemed to constitute and shall be credited as payments of the purchase price of promissory notes of the Pacific Company to be purchased by the parties of the first part, pursuant to the foregoing terms of this paragraph (a).

"(b) The Denver Company and the Western Company further jointly and severally covenant and agree semiannually, at the dates and in the manner hereinafter provided, out of the purchase price of the notes to be purchased by them as provided in paragraph (a) of this section, to pay unto the trustee: (1) From and after September 1, 1908, or the earlier acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, such amount as will, together with the amount actually and lawfully appropriated by the Pacific Company out of its earnings and other income and by it paid over to its fiscal agent in the city of New York (which may be the trustee), or its fiscal agent in the city of San Francisco, or both of them, for the purpose of paying the interest to fall due during the then current calendar half year upon the Pacific Company's said first mortgage bonds upon which interest shall be payable, be sufficient to pay all such semiannual installment of interest; (2) such amount as will, together with the amount actually and lawfully appropriated by the Pacific Company out of its earnings and other income and by it paid over to the trustee for the purpose of meeting the sinking fund payment, if any, required by said mortgage to be made by the Pacific Company during the then current calendar half year, be sufficient to meet such sinking fund payment."

Section 4 (e) of this article then proceeded to state that the Denver Companies on or before the 26th of February in each year would pay to the Pacific Company the amounts provided in clauses 1, 2, 5, 6, and 7 above mentioned,

and similarly on the 29th day of August and thereafter. The section concluded as follows:

"(d) The parties of the first part, on or before the 26th day of February and on or before the 29th day of August in each year, beginning with February, 1909, or with the February or August prior thereto next succeeding the acquisition and completion of the Pacific Company's main line of railroad from San Francisco to Salt Lake City, will pay to the trustee under said first mortgage of the Pacific Company the amount required to be paid by them in pursuance to the provisions of paragraph (b) of this section, to supply, with the amounts then already paid by the Pacific Company to its said fiscal agents or to either of them, the amount necessary to pay the semiannual interest upon the first mortgage bonds of said company to fall due upon the 1st day of the next succeeding month, and they will on or before the 29th day of August in each year from and after and commencing with the year 1911, pay or cause to be paid unto said trustee unto said first mortgage such additional amount as will, together with the amount then already paid unto the trustee by the Pacific Company, for that purpose, constitute and make up the full amount of the payment for the benefit of the sinking fund to be made by the Pacific Company for the then current year in accordance with the terms of its said first mortgage. All amounts paid or payable to the trustee under this agreement for the purpose of providing for the payment of interest shall constitute a trust fund for the payment of interest due or thereafter to become due upon the Pacific Company's first mortgage bonds, and shall be by the trustee made available at the fiscal agencies of the Pacific Company as hereinafter provided, but only for the payment of interest upon said bonds then due or thereafter to fall due as the same shall mature and payment thereof shall be demanded. Neither the Pacific Company nor any one claiming under it, save only such persons or corporations as may be entitled to receive the interest upon said first mortgage bonds, shall be entitled to or possess any interest in, lien upon, or claim to said fund, or any part thereof.

"(e) The Denver Company and the Western Company, parties of the first part aforesaid, hereby waive, and each of them hereby waives, any right which they or either of them might otherwise have to demand the delivery of any of the promissory notes to be purchased by them as provided in paragraph (a) of this section before or coincidentally with the payment by them of the purchase price of any such notes as provided in paragraphs (a), (b), (c), and (d) of this section, and the said parties of the first part and each of them will promptly pay the purchase price of all notes that they or either of them shall be under obligation to take hereunder at the times and in the manner herein provided, although the Pacific Company shall not at the time of any such payment have ready for delivery, or shall not have taken the steps necessary to authorize the delivery of, or for any other reason shall fail to deliver, any of such promissory notes; but neither of the parties of the first part shall be deemed by reason of the making of any payment prior to the receipt of the notes thereby paid for, or by reason of anything in this paragraph contained, to have waived or otherwise prejudiced the right of said parties or either of them to receive or to enforce the delivery by the Pacific Company of such or any notes that the parties of the first part or either of them shall pay for or shall have paid for hereunder.

"(f) The parties of the first part further jointly and severally covenant and agree that, in case the Pacific Company at any time when by the terms of this agreement the parties of the first part are under obligation to purchase from it any promissory note or notes by reason of the fact that its capital stock outstanding and subscribed shall not be sufficient in amount to authorize the issuance by the Pacific Company of such note or notes, the parties of the first part, or one of them, will subscribe for an amount of the unissued capital stock of the Pacific Company sufficient to render the issuance of such note or notes of the Pacific Company authorized and lawful."

Section 5 of article 2 bound the Denver Companies to pay to the trustee any taxes which the Pacific Company might be required to pay and to deduct from the principal or interest of the first mortgage bonds.

The third article, containing the engagements of the Pacific Company, provided that with all haste it should complete its main line of railway as provided and specified and turn over all its east-bound traffic to the Western Company and forward all west-bound freight from the Western Company, with certain provisions not necessary to mention, touching regulation and fixation of such rates, and that it would co-operate in maintaining a passenger service, with what might be incidentally necessary; further, that the Pacific Company should at the time of any payment by the Denver Company of any amount required under section 4 of article 2 execute the necessary promissory notes, so far as it legally might, and if it could not do it at once, that it would do so as soon thereafter as possible, and take such corporate action as might be necessary to give validity to such notes. The Pacific Company further agreed to apply all its gross earnings and income as the same should accrue to the same purposes set forth in section 4 of article 2, already quoted, and in addition out of the balance to pay the promissory notes provided for in that section. The Pacific Company further agreed on the 20th of February and the 23d of August of each year to pay the amount required for the installment of interest then due upon its first mortgage bonds to its fiscal agents in New York and San Francisco, and to cause its said agents to notify the trustees of such deposit, and likewise not later than the 23d of August in each year "actually to pay over to the trustee the amount to be paid by it for the purpose of making the sinking fund payment to fall due during the year expiring on the last day of the current month as required by the Pacific Company's said first mortgage."

Article 4 requires no description, and in article 5 the trustee agreed to hold the moneys received by it and to apply them to the purpose of the mortgage as therein provided, and from time to time upon request of the bondholders to enforce the provisions of article 2 touching payments to it, the trustee, and any modifications thereof.

Article 6 contains nothing necessary to mention in the first six sections thereof. The seventh section provides that the trustee shall notify the other parties semiannually of the amount of money held by it to pay the interest on the bonds and the amount required in addition to make the coming payment. Section 8 provides that the trustee shall make "available" to the fiscal agents of the Pacific Company all sums received by it from the Denver Company. Section 9 requires no comment. Section 10 provides that the failure of the Pacific Company to perform any of the covenants shall not be ground for rescission by the Denver Companies, who are relegated to specific performance or damages. Sections 11 and 12 require no notice. Section 13 provides that the agreement shall continue in full force and effect until all of the bonds "shall be fully paid, principal and interest, or until said bonds shall be called for redemption and provision made thereof for payment in full, principal and interest, * * * and shall run with the railways of the said several railway companies parties hereto into whosesoever hands the same may come, and this agreement and the provisions thereof shall be so construed that any person or persons, corporation or corporations, which may at any time acquire in any manner any of the said several railways of the parties hereto shall be held and be deemed to have expressly agreed by virtue of any act or acts, deed or deeds, or other instrument or transaction * * * through which the said persons * * * may * * * have acquired the said several railways, * * * to observe and perform all the terms required by this agreement to be performed or to be observed by the party hereto from whom * * * the said persons * * * may have acquired the said railways. * * * And the said person * * * shall be held to be bound by an express contract with the parties hereto and by and upon an express trust to perform and observe as aforesaid all the terms hereof;" further, that each of the railway companies agreed that, if it should part with any of the property herein, any instrument conveying the same should contain a covenant that the conveyance was subject to all the provisions of contract B, and that the grantee should by acceptance of the same become bound to perform its terms.

Section 14 provided that the obligation of the Denver Companies to make any of the payments provided in paragraphs 4 and 5 of article 2 should not be abrogated "until all of the bonds secured by the Pacific Company's first mortgage shall be fully paid principal and interest." It further provided that any of the provisions of the agreement except those contained in paragraphs 4 and 5 of article 2 could be modified in a way therein set forth. It further provided: "In case the Pacific Company * * * shall make default in the due payment of the principal of or interest agreed to be paid upon these bonds, * * * whereby a right of foreclosure shall thereunder accrue to the trustee, * * * the trustee shall * * * become vested with the right * * * to terminate this agreement (save and excepting always the provision for payments of interest, sinking fund contributions, and taxes contained in paragraphs 4 and 5 of article 2 hereof), * * * and upon the expiration of 30 days * * * this agreement and all other agreements * * * shall terminate, * * * but such termination of this agreement shall not be deemed to * * * release the rights of the trustee or of the holders of the first mortgage bonds * * * to the benefits of the agreements of the * * * party of the first part to make the payments provided for in sections 4 and 5 of article 2 hereof. * * *. Nothing herein contained shall be taken to authorize or to result in the termination of this agreement in any event or contingency (prior to the payment or provision for payment of all said first mortgage bonds, principal and interest, as aforesaid), except upon the election of the trustee made with the written approval of the holders of two-thirds in amount of the outstanding bonds. * * * But, whether before or after default, as aforesaid, the trustee * * * shall be entitled to specific performance of the same or of any agreement substituted therefor and to enforce the same by suits in equity or actions at law or otherwise as may be appropriate."

The mortgage of the Western Pacific Railway Company was of the usual kind, and need not be considered in detail, except as set forth below. It contains many references to contract B, and was drawn with the same in mind.

Article 5 of the mortgage set forth the remedies of the trustee and bondholders, and in section 2 provided that in case of default of any semiannual installments of interest for six months the trustee may "declare the principal of all bonds hereby secured then outstanding to be due and payable immediately." Section 3 declared that in case of default the trustee should be entitled at once to sell at public auction all the property of the road, "except only the right of the trustee * * * [under contract B] to require [the Denver Companies] to make any payment * * * of money to the trustee and to recover damages from said companies, * * * which said rights and all rights secured by said agreement necessary to the enjoyment and enforcement of said rights or remaining in and surviving to the trustee shall * * * survive to the trustee * * * despite any * * * sale made by virtue of this indenture, whether under the power of sale hereby granted or conferred or pursuant to judicial proceedings. * * *" Section 9 likewise provides that upon judicial sale the trustee shall not deliver contract B to the purchaser so long as the Denver Companies remain bound by the same.

Article 8 of the mortgage, the sinking fund provision, required the Pacific Company to create a sinking fund by setting apart out of the net income derived by it from the premises $50,000 a year, commencing with September 1, 1910, and thereafter until all said bonds, principal and interest, should be redeemed or paid.

Construction was begun upon the road which proceeded, and in August, 1910, was open for operation, though not formally turned over to its operating department until July 1, 1911. It had cost more than the proceeds of the first mortgage; the second mortgage bonds $25,000,000 being all sold at 75. This was indeed the occasion of the formation of the New Denver Company in 1908, which took all the second mortgage bonds and issued a mortgage of its own to finance the issue. Up to and including September 1, 1914, the New Denver Company paid the deficiencies in the net revenues of the Western Pacific Railway Company, amounting in the aggregate to over $13,000,000. No

installment of the sinking fund had ever been paid. because that fund was payable only in case the Western Pacific Railway Company during the current fiscal year had made some net earnings, and that condition had never arisen.

In August, 1914, and at the meeting at which it was decided to pay the September coupons, the board of directors caused a statement to be printed in the public press to the effect that, although the directors had authorized them to pay the September coupons, yet if the New Denver road was to continue to support the Western Pacific, some adjustment of its finances must be made, and that a call for the deposit of the Western Pacific bonds would be put forth looking to the adoption of a plan which would lighten the burden of the New Denver Company. No such arrangement was made, and in accordance with the declaration therein contained default was made on the coupon of March 1, 1915. At once the trustee filed its bill of foreclosure mentioned above and obtained the appointment of receivers. During the progress of the California foreclosure suit the receivers and the judge concluded that it was advisable to stay the entry of a decree in foreclosure until the receivers should bring suit under contract B against the New Denver Company, and for that purpose it was decided to assume jurisdiction over that company to take a decree against it in personam and to declare a lien upon its assets for the payments stipulated. Both the trustee and the New Denver Company, however, objected to this course, although the New Denver Company was not itself a formal party to the proceedings.

As before stated, the principal of the bonds before or during this had been declared due on December 18, 1915, and a reorganization committee much desired to put into effect a plan of reorganization which had been proposed. and in accordance with which a large majority of the outstanding bonds had already been deposited with the committee. The judge of the Northern district of California on February 28, 1916, made an order, however, enjoining the further prosecution of that suit and requiring the New Denver Company to be made a party thereto. From this decree an appeal was taken and a prohibition asked from the Circuit Court of Appeals of the Ninth Circuit. The matter was brought on for a hearing, and the Circuit Court of Appeals decided (Re Equitable Trust Company, 231 Fed. 571, 145 C. C. A. 457) that the decree of foreclosure should pass, and that the litigation under contract B should not take place in the foreclosure suit. Thereupon the decree of foreclosure was entered, fixing an upset price at $18,000,000. This price the court fixed after a hearing between the reorganization committee on the one hand, and certain minority bondholders, on the other, in which testimony was taken and an attempt made to fix as fair a value as was possible under the circumstances for the property at judicial sale. Of all of these proceedings the New Denver Company had actual notice, though not a party.

The decree provided for the sale along with its other property of the Western Pacific Railway Company's rights in contract B, but excepted the rights of the trustee under that contract, which were to remain unaffected by the sale, except in so far as they might be diminished by the payments upon the bonds. It provided that the bondholders might bid upon the sale, and that the amount of their bid should be credited upon their bonds. It likewise provided that the purchaser upon the sale should have the right within six months to assume any contract which was part of the property sold, whether made by the Western Pacific Company or its receivers, and should disclaim or reject the same if it did not wish to accept it.

The bid was assigned and the deed delivered to a new and reorganized railroad, the Western Pacific Railroad Company, which in December, 1916, filed a paper under the decree in the foreclosure suit in which it at once claimed the right to assert any rights formerly held by the Western Company in contract B, but not to assert any right in contract B the assertion of which would raise any liability on the part of itself under contract B. The supplemental or amended bill was filed within a few days after this election to assume such rights.

During the foreclosure proceedings the Western Pacific Railroad Company was represented by counsel selected by its officers. Its officers at the time had

been chosen through the voting power of the New Denver Company, which then controlled five-sixths of the stock of the Western Pacific; they were in part the same as the officers of the New Denver Company. One of the issues in the case was whether the attitude of the New Denver Company throughout the foreclosure proceedings estopped it from complaining of the action of the trustee in that proceeding, and in so far as this matter is relevant to the issues in question it is treated in the opinion below. It is not necessary at this place to set out any of the facts in detail.

The positions of the defendant are as follows:

I. That the obligation of the Denver Companies under contract B was only to provide for a fund consisting of the purchase price of promissory notes of the Western Pacific Railway Company; that it was therefore a conditional agreement, and under no circumstances could any liability arise unless the Pacific Company continued in position to execute the promissory notes required under the terms of that contract.

II. As a corollary of this position, since the giving of such notes and the application of the income of the railway were conditions to any liability on the part of the Denver Companies, it followed that the foreclosure of the first mortgage of the Pacific Company, coupled with the repudiation of contract B by the reorganized company, made impossible the fulfillment of this condition precedent, and that the liability therefor forever determined.

III. That the Denver Companies were in no sense responsible for the foreclosure, and that it could not therefore be held responsible for making impossible any performance of the condition upon its obligations under sections 4 and 5 of article 2; especially that, even though the trustee could have exercised its remedy of foreclosure without terminating the obligations of the New Denver Company, it was not essential to that remedy to declare the whole principal due in advance, and that the trustee's choice in so doing was in no sense to be attributed to the default upon a single coupon of the Denver Company; furthermore, that the Denver Company did no more in the foreclosure than protect its own interests, and had no power to control the trustee's conduct; therefore it was not called upon to take any position in respect of such conduct and could not be estopped.

IV. That if contract B was anything but a contract for the purchase of promissory notes of the Western Pacific Railway Company or of any company succeeding to its ownership, it was ultra vires the powers of the two Denver Companies.

V. That in any event the trustee might not elect to treat the default of the Denver Company of March 1, 1915, as a repudiation of all its liabilities under the contract in question and an anticipatory breach of the same, and therefore, even assuming it might sue for a single breach and recover damages, it must be content to avail itself in some form of its successive rights as they became due semiannually.

VI. That the maturity of the bonds on December 18, 1915, by the trustee's election forbade the conclusion that any future installment of interest could thereafter fall due upon them, and made any such interest sound in damages, and not in contract. The Denver Companies could not be held liable after the interest ceased under the tenor of the bond, for that was the term of their engagements.

VII. That in no event could there be any liability under the sinking fund provisions, since the sinking funds were to be paid in any event only out of the net earnings of the Western Pacific Railway Company, and that the termination of its existence prevented any net earnings from coming into existence, and even the determination of whether there could ever be any net earnings.

VIII. That the action and acquiescence of the trustee in securing the minimum upset price and the acquisition of the property at that price by the reorganization committee released the Denver Company from any further liability.

IX. That contract B created no equitable lien on the property of the New Denver Company.

Murray, Prentice & Howland, of New York City (George Welwood Murray and Franklin W. M. Cutcheon, both of New York City, and John F. Bowie, of San Francisco, Cal., of counsel), for complainant.

Chadbourne & Shores, of New York City (John G. Milburn, and A. J. Shores, both of New York City, and Henry McAllister, Jr., of Denver, Colo., of counsel), for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1] This being a suit based upon the direct contractual obligations of the Denver Companies to the trustee and indeed having been already held to be such in Re Equitable Trust Co., 231 Fed. 571, 145 C. C. A. 457, the first question is to inquire from the contract itself what provisions create any such obligations. Both parties agree that they are sections 4 (b) and 5 of article 2. The Denver Companies already in section 4 (a) had promised to purchase promissory notes of the Pacific Company equal in amount to the yearly deficiency of the Pacific Company's income to meet certain charges upon that income, among which were the installments of interest and the sinking fund. Clearly the provisions of section 4 (a), at least up to the proviso with which section 4 (a) closed, required the tender of the requisite notes before the condition of the obligation was performed. Moreover, section 4 (b), so far as it was couched in the same language as section 4 (a), while it did create an obligation direct to the trustee, required as performance only the same acts as were required by the promise to the Pacific Company, and any condition upon the one obligation must have been equally a condition upon the other. Some point is made touching the change in language between section 4 (a) and section 4 (b), the first being an out and out purchase, while the second is an undertaking to pay "out of the purchase price." Were there nothing more in the contract, I should hardly treat this difference in terms as indicating any purpose to compel the Denver Companies to pay to the trustee unconditionally. Without other language it seems to me that the promise to pay "out of the purchase price" would be conditional upon the same tender as was the promise to the Pacific Company itself. The other language in the contract, however, removes any doubt about the purposes of the parties.

The proviso of section 4 (a) itself recites that the payments made to the trustee shall be deemed to constitute payments of the purchase price of notes "to be purchased" by the Denver Companies, thus perhaps indicating that the payment in some cases will precede the delivery. Section 4 (e) with unnecessary amplitude stipulates that the delivery of the notes shall not be a condition precedent upon the obligation of the Denver Companies to make not only those payments covered by section 4 (b), but also those covered by section 4 (a). Section 4 (f) provides for the issue of stock to allow the issuance of the necessary notes. The purpose of section 4 as a whole is too clear for question. The Denver Companies were to insure the continuance of the Pacific Company as an operating railroad in return for its promissory notes. If for any reason the Pacific Company could not legally, or indeed would not (though the control over it was absolute), make

and deliver the notes, it was to be no excuse, for the determining motive, as must always be remembered, was the security of the bonds, and that security depended, as every one knew, upon the continued operation of the road. The whole purpose of the contract was to give the assurance of the Denver Companies' credit to the proposed issue. Therefore by the most explicit language, as well as by the most obvious deduction from the general purpose of the enterprise, it appears that the delivery of the notes was in no sense a condition upon the performance of the successive promises contained in section 4 (b), and I must confess that I cannot understand how any casuistry can for a moment throw any doubt upon the conclusion.

[2] Now, in the view that I take of the default of the New Denver Company on March 1, 1915, I do not think that the question is important as to whether the delivery of the notes was a condition precedent to the payment of any particular semiannual payment, because I regard that failure, coupled as it was with the expressed purposes of the Denver Companies, to constitute a repudiation which absolved the Pacific Company from any further delivery of the notes to be purchased by it. The construction of the promises in sections 4 and 5 of article 2 does, however, involve a much more important and serious consideration than this, since the New Denver Company now claims that the conduct of the trustee and the reorganized company upon the foreclosure and sale of the property was such as to deprive the New Denver Company of rights guaranteed it under the contract, and so to disable the trustee from claiming any future damages under the breach. Strictly speaking, this matter affects rather the amount of the damages to which the trustee is entitled, going as it does to what took place after breach; yet, since it fits appositely into the interpretation of the contract and involves the question of whether the obligations remained in existence after a foreclosure, if, for example, there had been only a default in the payment of a single coupon, I shall take it up now.

[3] The defendant's theory is that section 13 of article 2 provided that in any event the property of the Pacific Company should at all times remain subject to its promises to devote the income to the purposes mentioned in section 4 of article 2, and that any successor must continue so to devote that income and to give promissory notes to the Denver Companies for whatever advances they might be required to make. The conduct of the trustee in ending that possibility would therefore end the obligations if they ever became the subject of future suit, and would prevent their consideration in assessing any damages if there was a total repudiation. The defendant's theory is further that, regardless of the question whether the successor corporation was bound by promises of the Pacific corporation, the performance of those promises was a condition upon the New Denver Company's continued performance under sections 4 and 5 of article 2, since it is not possible that the Denver Companies meant to charge themselves with future installments of interest over an indefinite period when by no possibility could they receive the performance for which they bargained and when they must therefore be deprived, not only of the earning power of, but also of recourse against, the Pacific Company, upon

which they depended. The repudiation by the successor corporation of these promises at the least, therefore, excused the Denver Companies from future performance and for the purposes of such a suit as this terminated the contract, except for existing defaults.

It is necessary first to see what possibilities were open to the trustee upon a default. Certainly it could have foreborne the exercise of its rights of foreclosure, and could have brought successive actions at law under section 4 (b) of article 2 to recover damages for each breach. Conceivably, to avoid a multiplicity of suits, by recourse to a suit in equity, it might have obtained a decree at the foot of which successive applications could have been made as each six months expired. There can, however, be no doubt that the trustee was not limited under the contract to such remedies, because in section 14 of article 6 it is provided that in case of a default in payment of principal and interest, "whereby a right of foreclosure shall thereunder accrue," the trustee may terminate the contract, except sections 4 and 5 of article 2, and all rights of the Denver Companies not only in the property of the Pacific Company, but in its "income," should cease, without releasing, however, the rights of the trustee under those sections. Not only is the language wholly unequivocal, but such a right, even if less clearly put, could have no purpose were it not to free the title from any engagements of the Pacific Company, no one of which is contained in sections 4 and 5, and there could have been no reason to free the title except that the trustee when it came to sell the property in foreclosure should have the advantage of an estate unclogged by any incumbrances. Turning to the mortgage, it is apparent that the same purpose existed there; for among the remedies of the trustee, it is specifically provided, as already set forth, that the rights arising from those sections shall survive any foreclosure. In the face of all this, it is difficult to see with what color it can be urged that the trustee foreclosed at the peril of the continued existence of those sections.

Nor, if we look at the essence of the situation, could any other result have been intended, because, if it were not so, the right of foreclosure would be substantially, and indeed altogether, destroyed. The trustee's foreclosure would place it in the position either of abandoning the right of recourse against the Denver Companies, or of requiring any purchaser to accept a title subject to the condition of devoting all the income of the railway to the payment of the interest and the sinking fund, until the bonds were paid, and, if the income were not enough to pay interest, then to incumber the property with obligations to the Denver Companies for the balance. Indeed, all that would be accomplished by a foreclosure would in that case be to discharge the property of the principal of the debt. Now, it is, of course, the object of a foreclosure to relieve the mortgaged property from the debt, whether one regards the mortgagee's right as a legal title or only a lien, because only so can the debt be paid. The effect of retaining a part of the lien is merely to subtract from the purchase price that which the purchaser must continue to pay; it is, in short, to constitute that part of the debt which remains a lien prior to the part which is paid—a wholly anomalous situation. Indeed, in the last recital of con-

tract B it is said that the Pacific Company intended the agreement to be in all respects subordinate to the mortgage and as part of its security, so that the bonds may be more advantageously sold. The suggested result contradicts both these purposes; it makes the mortgage pro tanto subordinate to the contract, and it would most seriously impair the value of the bonds as such. The purpose was to add to the mortgage the security of the Denver Companies' credit; they being the parties chiefly interested in the enterprise and in absolute control of the mortgagor.

Those passages in section 13 of article 6 upon which the defendant relies do, if taken verbally, cover the contingency of a sale of the railroad in foreclosure, but their obvious purpose was of a wholly different kind, for they were intended to prevent any successor to the equity of redemption, or to the railroads of the Denver Companies, from abandoning their obligations to the trustee. To impose them upon the trustee is to misconceive the whole plan of the transaction, and to make it a trap for unwary bondholders.

Such being the proper interpretation of the instruments, the question remains whether the trustee was limited to a foreclosure simply for coupons due, or whether it might under the provisions of the mortgage accelerate the principal and take both principal and interest out of the purchase price. It will appear upon reflection that it makes no difference in substance whether or not the principal be accelerated. By section 6 of article 5 of the mortgage it is provided that the whole of the property shall be sold, either as an entirety or in parcels, and there is no warrant for a sale of a part only, reserving the lien upon the rest. Such a provision would be absurd in the case of a railway, which must be operated as a unity. Hence, though the sale were only for one or more coupons, it must still be of all the mortgaged property, and the surplus would necessarily remain subject to the lien of the principal and future interest. Yet if, as I have shown, any sale must free the purchaser from the engagements of the mortgagor, the only means of meeting the future installments of interest would be the interest derivable from that surplus. Under any conceivable circumstances it would be to the advantage of the Denver Companies that the surplus should be at once available upon the principal of the debt, which by implication involves an acceleration of its maturity, rather than that that debt should continue to carry interest according to the tenor of the instrument, leaving as a charge upon the Denver Companies not only full interest upon so much of the principal as the surplus would not pay, but also the inevitable difference between what the surplus could earn and the 5 per cent. stipulated. Such a purpose is so far out of the range of probable expectations as to be safely disregarded, and there is therefore every reason to suppose that the provisions for acceleration stipulated in the mortgage were not intended to have any effect upon contract B, other than if the foreclosure took place only for one or more coupons.

The supposed hardship upon the Denver Companies of such a result is unreal; they had it in their power always to prevent the termination of the Pacific Company's earning power by performing their

obligations. They were bound to the limit of their financial power to support that company, and their refusal was dictated by no more respectable consideration than a naïve unwillingness to keep on paying their debts. If they had indeed come to the end of their resources, it would mean that the whole enterprise was bankrupt, but they, of course, undertook, like every other promisor, to continue performance until that event. Then it would become a question of marshaling the two properties as the relative claims demanded.

I conclude, therefore, that under contract B, the trustee was entitled to exercise the remedies provided in the mortgage, and that the purchaser's assumption of the promises of the Pacific Company was not a condition upon the promises of sections 4 and 5 of article 2, whether or not the trustee had accelerated the principal as provided in the mortgage.

[4] The next question is of the validity of the contract construed as I have construed it; was it ultra vires the Denver Companies? It may be assumed for argument that the powers of these companies were limited to the purchase of promissory notes, and that an agreement simply to lend money to the Pacific Company for the purpose of meeting its obligations would have been ultra vires. First, it must be remembered, that the promises in sections 4 and 5 of article 2 at worst amount to no more than an engagement to pay the purchase price in advance of the delivery of the notes. Under section 4 (e) of article 2 such a contingency is distinctly provided for, and under section 4 (f) of article 2 the method by which the notes may be subsequently issued is stipulated, and the Denver Companies are committed to the necessary subscriptions. They were about to step into absolute control of the Pacific Company at the time of the contract, and certainly contemplated a continuance of that control. Had they likewise continued to perform their undertakings, they would not therefore have been called upon to do anything beyond their powers, unless the right to purchase obligations of a connecting road is limited to a purchase in which delivery is coincident with payment. That a provision like section 4 (e) of article 2 may be made the means of evading the statute is true enough, but no one asserts that it was so intended here. That provision was to insure the prompt payment of the current charges upon the Pacific Company's income without possible delays due to the necessities of corporate action in increasing the stock, but the notes were intended in good faith always to follow, and the payment of the purchase price would, even without the stipulations of section 4 (e), have entitled the Denver Companies at any time to compel the Pacific Company to execute the necessary notes. It seems to me scarcely arguable that the advances in payment were ultra vires.

As to the question of the Old Denver's being a "connecting" line under the Colorado statutes (Mills Annotated Statutes 1905, section 612 [a]), it is met not only by the case of Mo. Pac. R. R. Co. v. Sidell, 67 Fed. 464, 14 C. C. A. 477, but by the actual language of that section, which is that a railroad may buy the securities of any road connecting not only with itself, but with any road which shall connect directly or by means of any other line, which such company shall have the right, by contract or otherwise, when constructed, to use or operate.

However, it is urged that whatever the powers of the railroads to buy the notes of the Pacific Company while it continued to operate, if the contract continued after foreclosure, and so possibly covered a period when there was no Pacific Company properly so called at all, it was ultra vires under any theory. Now the only way in which the Pacific Company could cease to be an operating railroad, and so the only way in which the condition could arise, was for the Denver Companies to default in their own obligations, because they had in effect promised to continue its operation no matter what was its income. The argument is then pleasantly ingenuous, for it amounts to saying that the corporation was without power to make the contract, because it might refuse to keep it, and if it did, it might then have to do something else which was beyond its powers. It is the act of making the promise which is within or without the corporate powers, not the act of breaking it with its necessary consequences. The making of the promise is a valid act if it contemplates intra vires conduct; there can be no intra vires breach, and the results of any breach are the creatures of law alone. So it is quite irrelevant that the defendant, after breaking its contract, might be faced with a necessity which it could not have validly undertaken originally, quite as irrelevant as the possible necessity of submitting to a seizure of its corporate assets for breach of any other contract. The point raised thus involved a confusion of understanding of the purpose of the doctrine, and I therefore conclude that the contract was intra vires.

[5] Such being the character of the obligations, the next question is of breach. Had the New Denver Company defaulted upon one coupon only, clearly there could have been no recovery for more than that one. This default did not, however, stand alone; it was followed by a second default on September 1, 1915, and, after the principal had been accelerated (an act in itself revocable by the trustee), by a still further default on March 1, 1916. Until the sale on June 28, 1916, the defendant had made not the slightest move to indicate that it or its creature, the Pacific Company, meant to go on with further performance. It had taken no steps to re-establish the status quo or to put back the Pacific Company, then upon the conceded verge of financial dissolution, into a posture to operate and to earn its way. If there had been nothing more, this alone showed an intention to abandon the whole enterprise by a permanent withdrawal of the support which had been so elaborately pledged to the bondholders.

But the defendant's purpose was not left to inference merely, because it expressly declared what it meant to do. That declaration, the formal act of the New Denver Company, was published in the newspapers, and was directly communicated to those bankers who were known to be concerned with the interests of the bondholders. It was certainly intended to become known to the bondholders and to be the subject of their action. Obviously it was not convenient, and indeed it was impossible to tell each of them separately, and there could have been no conceivable purpose for the methods employed if it were not meant to advise the bondholders of what the New Denver Company proposed for the future.

What did it propose? Not to pay any more deficiencies of the Pacific Company unless the bondholders consented to abate their legal demands, and to that end unless they would deposit their bonds with the bankers so as to effect some compromise. To say that you will not pay as bound, unless the promisee makes some concession in his rights, is to say that you will not pay as you have promised at all. That is repudiation without even pretense of justification. When the default followed, it took its character from this preceding declaration, and gave the obligee the right to treat the contract at an end and, to sue. It is true that no direct repudiation was communicated to the trustee, but that was not necessary. The bondholders were the primary creditors, and the New Denver Company communicated as best it could to them. Their trustee could represent them in electing to accept it, and it did so when it brought suit while the repudiation remained unretracted.

Generally the mere declaration of a purpose to repudiate is enough, but here there was such an expression followed by appropriate inaction. In re Fitz George [1905] 1 K. B. 462, the creditor collected the several installments till the guarantor's bankruptcy, and that was treated as a total breach. It did not appear that the guarantor had repudiated till then. Repudiation is, however, a more certain breach than bankruptcy; at least, it has taken longer finally to establish bankruptcy as ground of suit for entire damages. Central Trust Co. v. Chicago Auditorium Hotel, 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580.

But it is said that such a result implied the possibility of the anticipatory breach of an obligation merely to pay money, and that the doctrine does not go so far. Washington Co. v. Williams, 111 Fed. 801, 49 C. C. A. 621; McCready v. Lindenborn, 172 N. Y. 400, 65 N. E. 208; Werner v. Werner, 169 App. Div. 9, 154 N. Y. Supp. 570. There are dicta to the same effect in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Nicolls v. Scranton S. Co., 137 N. Y. 471, 33 N. E. 561; Kelly v. Security Mutual Life Ins. Co., 186 N. Y. 16, 78 N. E. 584, 9 Ann. Cas. 661; Moore v. Security Trust & Life Ins. Co., 168 Fed. 496, 93 C. C. A. 632. In these cases it is generally stated that the doctrine only applies to cases which are mutually executory, but that must be deemed authoritatively overruled by Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580, in which the promisee had wholly performed. In this court, at least the limitation of mutuality cannot therefore apply. Furthermore, if performance remains mutually executory, the doctrine still applies, even though the promise is only to pay money, because that is the situation in the ordinary contract of sale repudiated by the buyer, Roehm v. Horst, supra. Lovell v. St. Louis Mutual Ins Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423, is another case where the promise was only to pay money. If the doctrine has any limits, they only exclude, and that arbitrarily enough, cases in which at once the promisee has wholly performed, and the promise is only to pay money.

Assuming what I do not mean to admit, that it has such limits, they result because the eventual victory of the doctrine over vigorous at-

tack (e. g., 14 Harv. Law Rev. 428; Daniels v. Newton, 114 Mass. 530, 19 Am. Rep. 384) has not left it scathless. Its basis in principle is that a promise to perform in the future by implication includes an engagement not deliberately to compromise the probability of performance. A promise is a verbal act designed as a reliance to the promisee, and so as a means to the forecast of his own conduct. Abstention from any deliberate act before the time of performance which makes impossible that reliance and that forecast ought surely to be included by implication. Such intermediate uncertainties as arise from the vicissitudes of the promisor's affairs are, of course, a part of the risk, but it is hard to see how, except by mere verbalism, it can be supposed that the promisor may within the terms of his undertaking gratuitously add to those uncertainties by announcing his purpose to default. Even the opponents of the doctrine concede that, if there be such an implied promise, its breach may drag in the damages upon the main promise. 14 Harv. Law Rev. 434, 435.

·Whatever the lack of logic in refusing to apply the doctrine to notes or bonds or the like, there can be no valid distinction between an ordinary contract of sale or of insurance, which the buyer or the insurer repudiates, and a contract like this, because this was not a contract unconditionally to pay fixed sums at fixed intervals. Rather, as the defendant is so fond of insisting, it was, at least in form, a contract of purchase, and no one has suggested that it makes any difference whether you buy hops or notes so far as this point goes. At least this consideration applies unconditionally to any repudiation of the New Denver Company to the Pacific Company. Not only in form was this a contract of purchase, but the Pacific Company had continuing obligations to perform while it continued. I agree that the same is not so true of the promises to the trustee which are here in suit, i. e., 4 (b) of article 2; yet I should, even if the trustee had no duties, be unwilling to make so arbitrary a cleavage in the doctrine at the expense of every consideration not only of principle, but of justice. For, if it were held that the doctrine applies as between the New Denver Company and the Pacific Company, but not between the New Denver Company and the trustee, this would be the result. Suppose that A. agrees with B. and C. to purchase a series of notes of B. and pay part of the proceeds serially to C., and he repudiates the whole enterprise midway in its performance. B. may sue at once, and recover damages for the future installments, but C. may not, because C. is bound to no further performance. It is safe to say that the law is not so whimsically capricious as that; yet that by hypothesis is precisely this case.

However, the hypothesis does not accord with the facts, because C. of the supposititious case, who is in fact the trustee, was bound to continue performance while the contract endured; for contract B required constant co-operation between all the parties, and no one could perform independently of the others. The plan was for the Pacific Company to pay to its fiscal agents out of its income enough to pay the semiannual interest. Section 5, article 3. If this proved insufficient, the trustee was to advise the Denver Companies four days beforehand how much was lacking from the amount required from it. Section 7 of article 6. The Denver Companies were to pay this to the trustee

(section 4 [b] of article 2), which was then to make it "available" to the fiscal agents of the Pacific Company (section 8, article 6). It is true that the failure of the trustee to notify the Denver Companies was to be no excuse for performance by the Denver Companies, but it was none the less bound to give the notice, and notification was part of the interrelated machinery. To say that this involved no co-ordinated performance, is simply to disregard the frame of the contract; to assimilate such a contract to a bond or a note rather than to a contract of purchase is to turn away from the nearer analogy. If there be any rational theory of anticipatory breach, it should cover the total repudiation of a standing arrangement of this character requiring the constant concord of all the parties.

Hence I conclude that the New Denver Company's repudiation was a breach of the whole contract and gave an immediate right to full damages. Justice certainly accords with principle in such a result; for the repudiation was without even color of justification, an undisguised and candid disregard of the most deliberate undertaking, put forth to be relied upon by the public at large.

[6] Thus arises the question of the remedies to which the trustee is entitled, and with it the extent of the relief. The default on March 1, 1915, resulted in no more than damages for the unpaid balance of that coupon. The same is true of the default on September 1, 1915. Before the third coupon came due the whole principal had been accelerated. The argument is that no further coupons could then become due, and that any interest upon the bonds necessarily arose thereafter by way of damages, and not according to the tenor of the instrument. In consequence it is said that contract B, which was only to pay interest upon the bonds, and not damages for failure to pay the principal on maturity, must terminate at that time. Had the obligation of the Denver Companies been until the maturity only of the bonds, this would have been a difficult question; for I cannot agree with the plaintiff's position that those provisions of the mortgage authorizing the trustee to accelerate "the principal of the bonds" left the coupons available as separate specialties. Moreover, it is extremely doubtful, to say the most, whether an agreement to pay interest till maturity carries any obligation after maturity. Re Fitz George [1905] 1 K. B. 462, was not such a case, because the guarantor agreed, as here, to pay interest until the principal was paid, not until it was due. King v. Greenhill, 6 M. & G. 59, turned in part, anyway, upon the short period which the guaranty would cover if so construed and the improbability that the parties had so intended. Hamilton v. Van Rensselaer, 43 N. Y. 244, and Melick v. Knox, 44 N. Y. 676, are the other way and directly in point. I should tend to follow them if the question was raised in this case, but it is not. The scrivener of contract B put the matter beyond any question in sections 13 and 14 of article 6 in language which by its very explicitness seems to have raised some question of its meaning. Moreover, it is perhaps not without significance that the engagements are always to pay "interest," and not "coupons." Such a promise was held to cover interest after maturity in Re Fitz George, supra, and indeed, upon the guarantor's bankruptcy, to justify a commutation of the future payments

into the unpaid balance of the principal. In the case at bar I cannot see how the purpose of the parties could be put more clearly, and it seems to me therefore irrelevant whether the principal matured in 1933 or in 1915. In either case the obligation to make up for the deficiencies of income remained what it was.

It is objected that so to construe the contract converts it into a promise to pay the whole balance due under the contract, and indeed in the outcome that is true. It was in fact the result in Re Fitz George, supra, where Lord Mersey awarded exactly that relief upon the guarantor's insolvency, and in Central Trust Co. v. Chicago Auditorium, supra, the Supreme Court seems to have awarded the present actuarial value of the future installments under the same circumstances. It is true that there the contract was terminable in time, but I cannot see that that makes a controlling difference in principle. The only difference is that in one case the payments are determined in number by the convention of the parties, while in the other by the same rule they are indeterminate. To agree to pay such a series until a time which may never come is to agree possibly to pay them forever. The result may be serious, but it is involved in the premises, and any rule of damages which allows the present valuation of a limited series of such future installments seems by implication to allow an indefinite series. It is quite true that the creditor gets his discounted future installments now in hand, which is something other than getting the full value later, but that is a necessary concession to some present disposition of the controversy, as near a remedial approximation as the circumstances permit. It is true also that the indemnitor's obligation is changed from a series in the future to a gross sum down, but that is a consequence not following merely from the original convention, but from his breach, which is a wrong and within his own choice. Damages sound in remedy and are by no means the equivalent of performance. Were it so, specific performance would be the only possible remedy, and even that not literally such. This is obviously the result when the indemnitor becomes insolvent, and it would be a strange rule which favored a frank repudiator over an obligor overtaken by bankruptcy.

[7] The next question is whether the sale in foreclosure injured the defendant and prevents a full recovery. I do not understand that the trustee's conduct is challenged beyond its "sympathy" with the majority bondholders in committee. I pass injured susceptibilities. The theory is that the majority, being about to buy, tried to fix the upset price as low as they could, which is the fact. The minority opposed them, as the defendant could have opposed them by intervention, had it not chosen to let the minority bondholders fight its battle. Formally, the majority's right to do so was unimpeachable. The sale establishes the value, and any upset price whatever is a concession to the known uselessness of an auction in such cases. If the upset price be too low, any creditor must protect himself by bidding, a possibility practically more available to such a party as the defendant than to individuals. So far as it has gone, the law has devised no other way to protect against what indeed in practice amounts to a strict foreclosure, except for the upset price. That judicial sales in such cases are of small value to creditors I cannot help; it results from applying the same

procedure to the sale of a quarter section and of a system of national transportation. Some form of valuing the property there must be, and we must work with what we have. Cases like Nor. Pac. Ry. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, Kan. City Ry. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579, and Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130, do not help the defendant. Here no stockholders slipped in ahead of the creditors; indeed, the second mortgage bondholders were excluded.

In the contest over the upset price, what were the majority to do? The issue was a real one to them, both as against the minority and under this very contract. Must they let it go by default, even though the court might on the minority's experts' evidence fix a price above any fair value? They did nothing but present their side to a court whose duty it was to decide justly. Must they assume that it would fail? It was not a case where by chilling the bids or maneuvering the time and place they prevented the realization of whatever the property could bring. All they did was to help in finding out the truth. I cannot see how they should have done less. When the price was fixed, if there was no other legal way to liquidate the security, the trustee was bound to sell it. If it had adopted any other way, the defendant would have challenged its propriety, because sale by foreclosure was the way indicated in the contract and in the mortgage. No other way suggests itself, except a judicial valuation of the road, which was indeed attempted, with as little satisfaction to the defendant. Therefore I conclude that the selling price of the road established its value for the purposes of contract B, and must be accepted as such.

Upon the question of the defendant's estoppel in pais during the foreclosure I need say nothing. The trustee and the majority did not step outside their rights, and there was nothing to waive. It is of no moment whether or not the defendant should have declared its position while the foreclosure was pending.

There remains the question of damages. At the time of the published declaration in August, 1914, the defendant repudiated the contract, and the trustee was free to treat each of the indefinite series of future deficiencies as due at its then actuarial commuted value. However, the Pacific Company still held the property and had its income, and the deficiency upon no single future installment could be ascertained; it remained contingent in amount and even in existence; no damages could then be determined. This posture continued until July 1, 1916, the date of the master's deed and the date upon which the purchaser became entitled to possession under the decree in foreclosure. One more coupon had fallen due meanwhile, and an installment of interest on March 1, 1916. It follows from the view I take of contract B that the maturity of the principal on December 18, 1915, did not affect the situation at all in respect of that installment; the interest continued as before. The deficiencies of March 1 and September 1, 1915, and of March 1, 1916, must be ascertained from the actual income of the road, and for that purpose the income earned by the receivers must be treated as income applicable to pay interest under section 4 (a) of article 2. Each of these three installments became due at

the time stipulated; the deficiency upon each thereafter was a debt due from the defendant to the trustee as of that date.

On July 1, 1916, it became certain that there would never be any further income available on the bonds, and the future deficiencies became fixed in amount and in existence. Some of the debt was paid as of that date, but the balance remained and must remain forever unpaid. By virtue of the repudiation each deficiency of the series became due at its then commuted value, if the trustee so chose, under Re Fitz George, supra, subject to limitation in the aggregate by the unpaid balance of principal. The unpaid balance is to be determined by deducting from the principal the purchase price realized upon the sale of the properties, $18,000,000, less such amounts as are properly chargeable in foreclosure, leaving a balance of $17,727,725.55. This subtracted from the principal of $50,000,000 is $32,272,274.45.

It will be asked what was the date of the breach, what that of the election to accept the breach, and which date counts in the ascertainment of damages. The repudiation of a contract opens to the promisee two courses of conduct, either to accept it at once as a termination and to sue for damages, or to wait and sue as the time for performance arrives. The latter course allows the repudiator to recant and to perform, and the promisee's delay subjects him to that possibility. The breach, however, remains the act of repudiation. The announcement in August, 1914, that the defendant would pay no more coupons therefore entitled the trustee to treat the whole contract as at an end, but for the reasons already given it would have been impossible at that time to prove any damages. The trustee did not, however, do anything upon the defendant's repudiation until May 27, 1915, when it filed its first ancillary and dependent bill in this court upon contract B. In the bill, article 16, it recited the power to declare the principal at once due and alleged its expected exercise of that power and of the right to sell the property for the full principal. In article 17 it alleged its inability to know the amounts due under contract B, and in the prayer for relief it asked for an accounting for the amount which should remain payable upon the principal and interest after the sale in foreclosure.

It seems to me to make no difference practically whether the filing of the first bill or of the second on January 6, 1917, be deemed an election to treat the conduct of the defendant as a repudiation. I shall assume that the first bill was such. At that time it is true that there could have been recovered only the unpaid balance of the coupon of March 1, 1915. If the suit had been at law, it would have been necessary to bring successive actions on September 1, 1915, March 1, 1916, and July 1, 1916, but that was not necessary in equity. By the supplemental bill it was permissible to set up the intermediate facts and the relief will be adapted to the situation disclosed at the time of the decree, Randel v. Brown, 2 How. 406, 423, 11 L. Ed. 318. Therefore the questions asked as to the time of the election are of no determining moment in the case at bar.

It is further said that the trustee had no power to elect to treat the repudiation as such, because it would result in a modification of the contract, and that could be done only as prescribed in section 14 of

article 6. The objection misconceives the effect of the repudiation and of the trustee's election. These did not constitute a modification of the contract. The repudiation was a breach of the contract, of that term in it which forbade the obligor to declare that it would be no longer bound by its stipulations. The remedy arose from that breach of suing for any future installment at once, and, if the defendant did not recant meanwhile, the right so to sue endured. Its election was no more than an expressed decision to sue, and that it evinced either on May 27, 1915, or January 6, 1917, I see no reason to decide which.

I have purposely omitted to refer to the sinking fund: First because, in the view I take of the rights arising under section 4 of article 2, the whole balance of the principal is in any case to be recovered; and, second, because by its terms it is due only out of the net earnings of the Pacific Company. Until July 1, 1916, there were no net earnings, and thereafter there could be none. It is true that it was because of the default of the defendant that this condition arose, but their wrong cannot make absolute what was otherwise contingent. There is no way of knowing when any sinking fund would become due or how much before the bonds matured in 1933.

The only other question which remains open is whether the promises under sections 4 and 5 of article 2 were liens upon the property of the Denver Company. I decline to determine this question, because no determination could be other than academic. That the payments were obligations is certain enough; they make the trustee a general creditor of the defendant, and as such they precede the rights of all stockholders. It could add nothing to their character to determine that they were liens, unless I had before me in this suit other possible lienors upon the property of the defendant. These cannot be joined without losing jurisdiction, and any expression of mine touching the priorities between such other lienors and the trustee would be brutum fulmen.

Finally the trustee asks for the instructions of this court as to what relief, short of a decree for the gross sum, it may properly accept. I have great question as to the power of this court, strictly speaking, to assume any general equitable jurisdiction over the conduct of the trust created, as well as the propriety of such an instruction in a suit inter partes, like this. However, it is quite true that this is a court of equity, and that its directions do not interfere with the disposition of a fund already within the jurisdiction of another court. In a proper case perhaps it might have the power to advise a trustee upon application by bill. The trustee must take its chances of protection under any advice I may give it, but I see no impropriety in saying that the immediate enforcement of a decree for so large a sum might well imperil the security of the decree itself. It seems to me, therefore, a reasonable exercise of that judgment which it is entitled to use to withhold process, and collect semiannually by way of interest upon the decree so much as will re-establish the relations which arose under contract B. It has certainly been suggested that the immediate enforcement of so large an amount would be impossible, and must result disastrously to the defendant. If so, it cannot be the duty of the trustee to cause the financial collapse of the debtor upon whose stability it must rely. As

to further litigation designed to ascertain the priorities between the trustee's decree and other lienors, I must leave it to its own devices.

[8] It is possible that questions will arise for determination before a decree can be determined. I can at present think of none, except the rate of interest which will accrue upon the unpaid balance of the three installments and upon the balance of the principal. In New York the rate of interest upon default is fixed at the legal rate regardless of the rate before maturity, Pryor v. City of Buffalo, 197 N. Y. 123, 90 N. E. 423, and the matter is one of state law, Ohio v. Frank, 103 U. S. 697, 26 L. Ed. 531. It seems to result, therefore, that the interest must be calculated at 6 per cent., which rate with reluctance I feel obliged to fix.

As to the sum of money impounded by injunction at the outset, the trustee may have process of execution under the eighth rule as soon as the decree passes. I can at present see no warrant for supposing it subject to the lien of engagements of the defendant. Its origin has not been disclosed, and whether or not there is a lien upon the railroad of the New Denver Company, there can hardly be said to be any lien upon its general funds. A modification of the injunction order prior to the entry of decree and to opportunity for execution seems hardly proper, however, as it might result in depriving the court of any means of enforcing its decree. That matter the defendant may, if it chooses, bring up upon notice.

Should it be necessary to have any extended hearing to determine the form of the decree, the matter may come on before Philip L. Miller, Esq., as special master. Otherwise the decree may be noticed for settlement at chambers on any day. The plaintiff will have its costs. So far as I am now aware, the foregoing disposes of all the questions raised.