## In re WISCONSIN CENT. RY. CO.

### No. 17104.

District Court, D. Minnesota,
Fourth Division.

Dec. 19, 1946.

694

See also, D.C., 68 F.Supp. 320.

George W. Morgan, of St. Paul, Minn., and M'Cready Sykes, of New York City (Morgan, Chase, Headley & Hoshour, of St. Paul, Minn., and Stewart & Shearer, of New York City, of counsel), for trustees under the First General Mortgage.

Olin, Murphy & Redmond, of New York City, and Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn. (Thomas P. Helmey, of Minneapolis, Minn., of counsel), for First and Refunding Mortgage Trustees.

Henry S. Mitchell and Leonard H. Murray, both of Minneapolis, Minn., for Canadian Pac. Ry. Co.

James E. Dorsey and Donald West, both of Minneapolis, Minn., for trustees of the debtor company.

Cravath, Swaine & Moore, of New York City, and Frank A. Janes, of Minneapolis, Minn. (Frank H. Detweiler, Frank J. Pohl, and William E. Collins, all of New York City, of counsel), for Chemical Bank & Trust Co. and John A. W. Richardson, Jr., of New York City, trustees under Superior and Duluth Division and Terminal First Mortgage.

Mudge, Stern, Williams & Tucker and A. Albert Minton, all of New York City, and Bergmann Richards, of Minneapolis, Minn. (Paul Duryea Miller and John Wallis, both of New York City, of counsel), for Protective Committee for holders of Superior and Duluth Division and Terminal First Mortgage Bonds.

NORDBYE, District Judge.

The Trustees of the First and Refunding Mortgage are only advancing their claim for increased interest after February 15, 1945, the effective date of the accelerated maturity of the bonds, in the event increased interest is allowed on the claim of the First General Mortgage Trustees at the rate of six per cent after July 1, 1946, which is the effective date of the accelerated maturity of those bonds. The Refunding Trustees urge that the claim of the First General Trustees is untenable and should be disallowed. The Trustees of the Superior and Duluth Division and Terminal First Mortgage, the Superior and Duluth Protective Committee, and the Trustees of the debtor herein protest the claims of both the First General and Refunding Trustees for increased interest after the accelerated maturity of their bonds. In determining the issues submitted, therefore, in view of the position of the Refunding Trustees and the conclusion hereinafter indicated, it only becomes necessary to consider the claim of the First General Mortgage Trustees.

This court held in a decision filed September 14, 1945, 63 F.Supp. 151, 157, that the holders of the Superior and Duluth Division and Terminal First Mortgage Bonds of the debtor, which matured without acceleration on May 1, 1936, were entitled to interest after maturity at six per cent per annum instead of at the contract rate of four per cent. The court applied the New York law, which provides that the statutory interest rate of six per cent governs after the maturity of the debt unless the parties have stipulated in the contract for a different rate. Judge Moscowitz, in a more recent decision in Re Realty Associates Securities Corporation, D.C.N.Y., 66 F.Supp. 416, reiterated this rule as settled New York law. The problem here, therefore, is whether the parties to the First General Mortgage have agreed in their contract that the rate of interest to be paid before maturity will govern until the maturity of the debt in 1949, even though an earlier accelerated maturity date may be effected by the mortgagee under the contract.

The factual situation is as follows: The First General Mortgage Protective Com-

mittee, in collaboration with the Trustees of that mortgage, filed in this Court and with the Interstate Commerce Commission a plan of reorganization dated December 21, 1944. The plan proposed the satisfaction of the entire claim of the First General Mortgage for principal plus interest at the rate of four per cent per annum until the effective date of reorganization, partly in cash and the remainder in new bonds bearing interest at four and four and one-half per cent per annum. The maturity date of the First General Mortgage had not been accelerated at that time. Hearings were had on the plan before an examiner of the Interstate Commerce Commission, and in August, 1946, the plan, substantially along the lines proposed by the First General Group, was recommended for approval to the Commission. Exceptions to the report of the examiners had been filed by the Superior and Duluth Group and arguments before the Commission were held on November 26, 1946. In the meantime, and on July 1, 1946, the First General Trustees, upon written request of the holders of thirty per cent of the amount of the debtor's First General Mortgage Bonds, have declared the principal of all bonds secured thereby to be immediately due and payable pursuant to Article Four, Section 3, of the mortgage, and this petition for increased interest on their claim followed.

■ The fundamental rule is that the intention of the parties must be determined from the entire contract if such intent is to be found within the scope of its provisions. A consideration of the various contract provisions of the mortgage leaves little doubt as to the intent of the parties with respect to the interest rate which should prevail after the accelerated maturity of the bonds and before the date of maturity as stipulated in the mortgage. The First General Mortgage Bonds provide that the Railway Company "promises to pay * * * one thousand dollars * * * on the first day of July in the year nineteen hundred and forty-nine * * * and to pay interest thereon from July First 1899 at the rate of four per cent. per annum, * * * semi-annually, on the first day of January and of July in each year, but only upon presentation and surrender as they severally mature of the interest coupons hereto annexed."

The covenant of the railroad in the mortgage further discloses the intention of the parties in providing for the payment of the principal and interest at the rate of four per cent from July 1, 1899, to July 1, 1949. This intention seems manifest in the provisions of Article Two, Section 1, where the railroad covenants as follows:

. "It will duly and punctually pay or cause to be paid, to every holder of any bond issued and secured hereunder the principal and interest accruing thereon at the dates and place and in the manner promised in such bonds or in the coupons thereto belonging, according to the true intent and meaning thereof, * * *."

It would seem that the language to be found in these covenants fairly sets forth an agreement on the part of the railroad to pay interest at the rate of four per cent from the date of the bonds semi-annually each and every year until July 1, 1949. No other rational interpretation of the intention of the parties seems logical. Moreover, in Article Four, Section 3, of the mortgage, it is provided that the acceleration of the mortgage is made subject to the express condition that before sale the mortgage can be reinstated upon the payment of "all arrears of interest upon all such bonds, with interest at the rate of four per cent. per annum on overdue instalments of interest, and the expenses of the Trustees, shall either be paid by the Railway Company or be collected out of the mortgaged premises before any sale of the mortgaged premises shall have been made, then and in every such case the holders of a majority in amount of the bonds hereby secured then outstanding, by written notice to the Railway Company and to the Trustees, may waive such default and its consequences; * * *."

When the parties provided for the waiver of default after acceleration by the payment of all arrears of interest upon such bonds, it seems quite clear that they were referring to the stipulated interest of four per cent on the bonds. When they referred to arrears of interest upon such bonds, it is not reasonable to assume that they were referring to some legal rate of interest which might perchance be lower or higher than

the stipulated rate. Indeed, the fact that they required interest at four per cent on interest arrearages is persuasive that the interest was to be computed at four per cent on the principal in accordance with the contract. Further light is evidenced from Article Four, Section 2, which deals with the remedies of the Trustees and bondholders. Upon default in the payment of interest or the principal of any bond or of any of the covenants to be performed, the Trustees may enter upon and operate the mortgaged premises, and the net income realized is to be applied as follows:

"In case the principal of the bonds hereby secured shall have become due, by declaration or otherwise, first, to the payment of the accrued interest (with interest on the overdue instalments thereof at the rate of four per cent. per annum) in the order of the maturity of the instalments, and then to the payment of the principal of all bonds hereby secured, * * *."

Substantially the same language is used in this section with reference to the application of earnings if the bonds are not due. The paragraph in that regard states:

"In case the principal of the bonds hereby secured shall not have become due, to the payment of the interest in default in the order of the maturity of the instalments of such interest, with interest thereon at the rate of four per cent. per annum; * * *."

When one of these provisions, under which the principal is not due, uses the term "payment of the interest in default," and the other, under which the debt is due, uses the term "to the payment of the accrued interest," and both refer to payment of interest "in the order of the maturity of the instalments," it is reasonable to conclude that both provisions refer to the semi-annual interest instalments computed at four per cent, as provided in the bonds. No suggestion or intention in this section or in any of the provisions of the contract is to be found with reference to any other rate of interest on the theory of breach of contract if the principal of the bonds has become due by declaration. Moreover, the so-called legal rate of interest would not be payable necessarily in instalments as the contract so frequently mentions when re-

ferring to interest after maturity of the debt by declaration. It seems quite evident, therefore, from these two provisions that, although the principal of the bonds may become due by acceleration, the parties intended to keep the semi-annual interest coupons intact for the purpose of determining the disposition upon default of any net income which should be distributed to the bondholders. Language signifying a similar understanding between the parties is to be found in Article Four, Section 13, of the mortgage contract. This provision pertains to the manner in which settlement or payment may be made for the property in case of sale. This section provides:

"In case of any sale hereunder, any purchaser, for the purpose of making settlement or payment for the property purchased, shall be entitled to turn in any *bonds and any matured and unpaid coupons hereby secured,* in order that there may be credited, as paid thereon, the sums payable out of the net proceeds of such sale to the holder of such bonds and coupons as his ratable share of such net proceeds, after allowing for the proportion of the total purchase price required to pay the costs and expenses of the sale, or otherwise; and such purchaser shall be credited, on account of the purchase price of the property purchased, with the sums *payable out of such net proceeds on the bonds and coupons so turned in;* and at any such sale, any bondholders may bid for, and purchase, such property, and may make payment on account thereof as aforesaid, and upon compliance with the terms of sale, may hold, retain, and dispose of such property without further accountability therefor." (Italics supplied.)

This portion of the contract makes it clear that, upon sale, in determining the application of the proceeds, the outstanding coupons will represent the instalments of interest overdue and that the outstanding coupons may be used by a purchaser as a credit upon his bid. All of which negatives any intention to change the rate of interest after the accelerated maturity of the bonds.

It will be remembered that, throughout the mortgage, it is provided that the overdue coupons shall bear interest at the rate of four per cent. As cogent evidence that the parties intended that the four per cent

rate should continue on the bonds themselves if they were accelerated by declaration, reference may be made to Article Four, Section 14. There, the Railway Company covenanted: " * * * (2) in case default shall be made in the payment of the principal of any such bonds when the same shall become payable, whether at the maturity of said bonds, or *by declaration as authorized by this indenture* or by a sale of the mortgaged premises as hereinbefore provided, then upon the demand of the Trustees, the Railway Company agrees to pay to the Trustees for the benefit of the holders of the bonds and coupons hereby secured, then outstanding, the whole amount due and payable on such bonds and coupons, for interest or principal, or both, as the case may be, *with interest upon the overdue instalments of interest at the same rate as the respective bonds on which such instalments of interest shall be overdue;* * * *."* (Italics supplied.)

Here, it will be observed that, instead of specifically providing for interest on overdue instalments at the rate of four per cent, as is so frequently found in this indenture, the parties simply provided that the interest on overdue instalments should be at the same rate as the respective bonds on which such instalments of interest shall be overdue, strongly indicating that the parties assumed that the four per cent rate on the bonds continued after maturity by acceleration.

The various provisions of the contract referred to all tend to substantiate the view that, regardless of default and declaration by the Trustees to mature the debt, the rate of interest on the debt as agreed between the parties will prevail, at least until July 1, 1949. This conclusion is in harmony with the reasoning and result reflected in Farmers Loan & Trust Co. v. Northern Pacific R. Co., C.C.Wis., 1899, 94 F. 454. There, according to the opinion, the bond provided:

"The bonds in question bear date December 2, 1889, and are respectively payable on the 1st day of December, 1989, 'and interest thereon in the meantime at the rate of five per cent. per annum, * * * semiannually, on the first day of June and on the first day of December in each year.' "

Coupons were attached to each bond for the semi-annual interest contracted to be paid for the entire term of one hundred years. Parenthetically, it may be stated that coupons are attached to the Wisconsin Central bonds for the semi-annual interest contracted to be paid for the entire term of fifty years. There, as here, the Trustees accelerated the maturity of the bonds upon default and the question arose whether after the accelerated maturity the bonds bore interest at five per cent, the stipulated rate in the bonds, or six per cent, the legal rate of interest. The court held that the contract rate of interest governed until the stated maturity, stating (94 F. at pages 455, 456):

"Here the obligor by its bond agreed to pay a certain sum of money on December 1, 1989, a period of 100 years from the date of its obligation, and to pay interest upon its debt in the meantime,—that is, until December 1, 1989,—at the rate of 5 per cent. per annum. It attached to each obligation coupons representing the semiannual interest at that rate and for that period of time. The stipulation of the trust deed which authorizes the trustee at its election to mature the principal upon default in the payment of interest does not purport to abrogate the rate of interest which the obligor agreed to pay during the stated period. The exercise of the election matured the principal, but left untouched the stipulation for interest. The rate was agreed upon by the parties to the contract, and was to continue during a stated period of time, and that rate should govern during that period of time, notwithstanding that by the election of the trustee the principal was matured at an earlier date than that specified in the contract."

The only material difference between the wording of the bond in the Farmers Loan & Trust Co. case and the present bond is to be found in the words "in the meantime," which are to be found in the bond in that case as noted in the fourth line of the above quotation. But the promise of the Wisconsin Central Railway Company to pay interest at four per cent from July 1, 1899, to July 1, 1949, is just as implicit in the present bond as if the words "in the meantime" had been inserted between the words "thereon" and "from," noted in the foregoing re-

cital from that bond. The duration of the covenant to pay interest at the specified rate for the stipulated number of years is at least impliedly definite and certain in both bonds.

In support of First General's contention, reference is made to cases which indicate that the interest coupons subsequently maturing are void and of no effect after the maturity of the debt is accelerated. Equitable Trust Co. of New York v. Western Pacific R. Co., D.C., 244 F. 485; Mississippi Valley Trust Co. v. Oklahoma R. Co., 10 Cir., 156 F.2d 283. But even though the coupons are not available as "separate specialities," as pointed out by Judge Learned Hand in Equitable Trust Co. v. Western Pacific R. Co., resort need not be made exclusively in the instant situation to the interest coupons in order to determine the rate of interest that the parties agreed upon. Moreover, the technical effect on interest coupons as separate specialities on maturity of the debt on acceleration is not controlling of the question presented. The many references to them in the mortgage contract tend to disclose the intention of the parties notwithstanding that the interest payments after maturity may be payable under the provisions of the bonds rather than the coupons. Here, the bonds themselves expressly provide that interest shall be paid at four per cent from July 1, 1899, semi-annually on the first day of January and July of each year. From the bond, the plain intendment is that the same rate of interest shall be paid during the entire fifty-year period.

When a contract is matured by its terms and no rate is provided for interest after maturity, there may be no alternative but to allow interest, not by virtue of contract, but by virtue of damages by its breach. O'Brien v. Young, 1884, 95 N.Y. 428, 433, 47 Am.Rep. 64. But here, the contract, although the maturity is accelerated, furnishes unmistakable indicia which point to the intention of the parties to continue the contract rate of interest. Any other view would be a plain distortion of the evident intent of the parties. The various contingencies arising after acceleration could not be fulfilled within the purview of the understanding of the parties were any other construction to prevail. It is only necessary to apply a common-sense construction to the many references in the contract which direct one to the intention and understanding of the parties in this regard. These conclusions are in harmony with the equitable principles which may be applicable under the circumstances in view of the apparent reasons that induced the acceleration of the mortgage and on account of the pending reorganization of the road. See the late decision of the Supreme Court of the United States in Vanston Bondholders Protective Committee v. Louis A. Green, et al., 67 S.Ct. 237.

In view of the foregoing, therefore, and the recognition on the part of the Refunding Trustees that their claim for increased interest should be denied if the claim in this regard is not sustained as to the First General Trustees, it follows that the claims of both the First General and First and Refunding Trustees must be denied to the extent that they request interest thereon in excess of the contract rate. It is so ordered.

An exception is allowed.